Petition of Sumner A. LONG, Owner, and Annie Quinn Corp., Charterer, and Earl J. Smith & Co., Inc., Agent of the S.S. SMITH VOYAGER for Exoneration from or Limitation of Liability.

No. 65 AD 55.

United States District Court
S. D. New York.

Oct. 29, 1968.

Zock, Petrie, Sheneman & Reid, New York City, for petitioners, Edwin K. Reid, John R. Sheneman, Howard M. McCormack, New York City, of counsel.

Baker, Nelson, Williams & Mitchell, New York City, for claimant India Supply Mission, O. Taft Nelson, Robert M. Atkinson, Robert E. Meshel, New York City, of counsel.

Davis & Davis, New York City, for claimant Anna Veenstra, Harold Davis, New York City, of counsel.

Freedman, Borowsky & Lorry, Philadelphia, Pa., Abraham E. Freedman, New York City, for individual claimants, S. Gerald Litvin, Barton A. Pasternak, Philadelphia, Pa., of counsel.

### OPINION

BONSAL, District Judge.

Petitioners instituted this proceeding, pursuant to 46 U.S.C. § 183 et seq., for exoneration from or limitation of liability with respect to claims arising by reason of the sinking of the S/S SMITH VOYAGER (the VOYAGER) in the Atlantic Ocean on December 27, 1964. The petitioners are:

Sumner A. Long (Long), the owner of the vessel;

Anne Quinn Corporation (Quinn), the bareboat charterer; and Earl J. Smith & Co., Inc. (Smith), the general agent for Quinn.[1]

Thirty-five claims have been filed by or on behalf of members of the crew (individual claimants), including four death claims and thirty-one personal injury claims (one of which was settled during trial). In addition, the India Supply Mission (cargo claimant) has filed a claim for the loss of the cargo consisting of 10,204 tons of grain.

A trial, limited to the issue of liability, was held in June and July 1968, the adjudication of claims, if any, being reserved for later determination.

The VOYAGER sailed from Houston, Texas on December 12, 1964, carrying a cargo of 10,204 tons of grain bound for India. She called at Freeport, Grand Bahama Island, B.W.I., on December 15, 1964, where she took on fuel and water. On December 20, 1964, she encountered rough weather at sea. At about noon on that day, her engines were shut down because of a broken steampipe. Before repairs could be completed, the vessel took a sharp list to starboard and the general alarm was sounded. One of the lifeboats was launched and all but the Captain and three crew members left the vessel and took to the lifeboat. Four members of the crew who had left the vessel lost their lives and the rest were picked up by the S/S MATILDA BOLTEN. The VOYAGER remained afloat until the morning of December 27 when she sank by the stern. Between December 20 and December 27, the Captain and the three members of the crew who remained on the vessel were taken off, salvage operations were undertaken, and the vessel sank while under tow.

In seeking exoneration from or limitation of liability, petitioners were required to establish that the vessel was seaworthy when she broke ground at Houston and to bring out the facts known to them which might have a bearing on the cause of the disaster. Petition of Moore-McCormack Lines, Inc., 147 F.Supp. 816 (S.D.N.Y.1957). Following the petitioners' presentation, the claimants had the burden of proof to es-

---

1. Quinn, as bareboat charterer, is deemed an owner of the VOYAGER within the meaning of Section 183. Petition of Russell Bros. Towing Co., 199 F.Supp. 442 (S.D.N.Y.1961); see Section 186. As for Smith, Quinn's general agent, claimants do not contend that Smith is not entitled to petition for relief under the Limitation Act, and it appears that Smith might be considered a "charterer" under Section 186. See Stewart v. United States Shipping Board Emergency Fleet Corp., 7 F.2d 676, 678 (E.D.N.Y.1925). However, in light of the disposition of the petition herein, this question need not be resolved.

tablish liability, and if they failed to do so, petitioners would be entitled to exoneration. Petition of Trawler Snoopy, Inc., 268 F.Supp. 951 (D.Me.1967). If the claimants established liability, the burden of proof shifted to the petitioners to show that they are entitled to limitation of liability because the vessel was seaworthy when she broke ground at Houston and because they had no privity or knowledge as to the cause of the disaster. Petition of Moore-McCormack Lines, Inc., supra.

■ This procedure was followed at the trial and, for the reasons hereinafter stated, the court finds that a substantial cause of the disaster was the overloading of the vessel which condition continued from the time she broke ground in Houston on December 12, 1964. The court further finds that the petitioners had privity or knowledge of the overloading and that, accordingly, the petition for exoneration from or limitation of liability must be denied.

The relevant facts stipulated by the parties or brought out at the trial may be briefly summarized as follows:

The VOYAGER was a Victory type vessel built in 1945 with an overall length of 445 feet 3 inches, breadth of 62 feet 1 inch, a gross tonnage of 7,606, a net tonnage of 4,549, and a total deadweight capacity of 10,720 tons.

From December 2 to December 9, 1964, the VOYAGER lay at the San Jacinto Terminal in Houston for the installation of grain fittings. On December 9, she moved to the Goodpasture Grain Elevator. She was light at the time, and while she was sailing down the Houston Ship Channel, Captain Frederick W. Mohle ordered the helmsman to get coffee and took the helm himself. While the Captain was at the helm, the vessel went aground on the north bank of the Houston Ship Channel at an angle of approximately 45 degrees. She remained aground about one hour when she was freed by two tugs in attendance and she then proceeded to the Goodpasture Elevator. The Captain reported the grounding to the petitioners by letter dated December 9, 1964, but the grounding was not reported to the Coast Guard until April 1965, after the sinking. Soundings were taken of the VOYAGER's forward tanks to determine whether the vessel had taken water, but no physical examination of the plates of the vessel was made.

At the Goodpasture Grain Elevator the VOYAGER loaded 10,204 tons of grain. She sailed with 154.5 tons of fuel and 120 tons of water. To be on her marks, her permissible mean draft (summer) was 28 feet 6¾ inches according to her International Load Line Certificate.[2] The parties conceded that she was entitled to a fresh water allowance of 6 inches because the water in Houston harbor is brackish and not salt. This entitled the vessel to a permissible mean draft at the time she left Houston of 29 feet ¾ inch. On the basis of the evidence adduced at the trial, the court finds that when she completed loading at Houston, she had a mean draft of 30 feet 1 inch, or after allowing 6 inches for salinity, 29 feet 7 inches. She was therefore below her marks by more than 1 foot. Her permissible freeboard (shown on the Capacity Plan) was 9 feet 7 inches. When she left Houston, by reason of the overloading, her freeboard was approximately 1 foot less.

There was substantial evidence to show that the vessel was below her marks to the extent indicated. Smith's loading agent in Houston wired Smith at sailing that she had a mean draft of 29 feet 7

2. According to the U.S. Coast Guard Load Line Regulations, the "loadline is the line defining the maximum mean draft to which a vessel may be lawfully submerged"; and freeboard is "the distance measured vertically downward at the side of the vessel amidships from the upper edge of the deck line to the upper edge of the load line." 46 C.F.R. § 43.05–1 (1963).

The "draft" of a vessel is the distance from the bottom of the keel to the waterline; the mean draft is the average of the forward and after draft readings.

inches, and the same figure was contained in the VOYAGER's port log sent by the Captain to Smith following the vessel's departure.[3] The pilot on the vessel when she sailed on December 12 testified that, as the vessel sailed, he was informed by the Captain that the draft in fresh water was 30 feet 2 inches, and that he was given a form signed by Captain Mohle giving this figure.

Had she been loaded to her permissible mean draft of 28 feet 6¾ inches, the vessel would have displaced 15,199 tons. With a draft of 29 feet 7 inches, she in fact displaced 15,860.5 tons. Thus, by reason of overloading, the VOYAGER sailed over 1 foot below her marks and approximately 660 tons overweight.[4]

The voyage from Houston to Freeport, Bahamas took approximately three days. The parties have agreed that she consumed an average of 70 tons of fuel and water per day, so that when she arrived in Freeport, she had consumed approximately 210 tons of fuel and water. Based on records of prior voyages, she consumed an estimated 35 tons of fuel and water during the ten hours she lay in Freeport.

At Freeport, the vessel took on 928.2 tons of fuel and water. After deducting the fuel and water previously consumed, she weighed 683.2 tons more when she

left Freeport than when she left Houston. Based on the vessel's Capacity Plan (which shows an immersion rate of 51.5 tons per inch), she left Freeport 13 inches farther down in the water than when she left Houston, or approximately 25 inches below her marks.

Applying the same rate of consumption of fuel and water to the period between leaving Freeport to noon on December 20 when she lost power, would indicate that during this period she consumed 350 tons of fuel and water. Thus, when she lost power she weighed 333.2 tons more than when she left Houston and she was 19.2+ inches below her marks. Therefore, at this crucial time, instead of a permissible freeboard of 9 feet 7 inches as indicated on the Capacity Plan, she had a freeboard of only 8 feet. Hence the vessel was overloaded and unseaworthy from the time she broke ground at Houston on December 12 to the time of the disaster.[5]

Claimants contend that the overloading was a substantial cause of the disaster. Petitioners deny this and suggest that the disaster was due to the shifting of the grain cargo. The shifting, petitioners say, was not due to any fault on their part but was due to the existing Coast Guard regulations which did not require the use of centerline boards in the grain feeders.[6] Captain Hewlett R. Bish-

---

3. The Chief Mate, Bennett, testified that he had taken the draft readings from which he concluded that the vessel was "exactly on her marks" and that this was "most unusual." He could not remember the fore and aft readings but thought they indicated that the vessel had a hogging condition which would make the midship marks misleading.

4. According to the VOYAGER's Capacity Plan, the vessel displaced 15,500 tons when she had a mean draft of 29 feet, and displaced an additional 51.5 tons for each inch of draft above 29 feet. An additional 7 inches of draft results in an additional displacement of 360.5 tons, making a total of 15,860.5 tons, or approximately 660 tons overweight. (At her permissible mean draft of 28 feet 6¾ inches, she would have displaced 15,199 tons.) The computations made hereafter are

based upon the permissible mean draft of 28 feet 6¾ inches and the permissible freeboard of 9 feet 7 inches.

5. Claimants allege a number of other factors affecting the seaworthiness of the vessel, including a "blackout" in Houston, difficulty with the evaporators, which required the vessel to take on more fresh water than required in previous voyages, a leak in the rudder stock plan causing minor flooding in the steering engine room, and the general rundown condition of the vessel. While the evidence indicates that the vessel was not adequately maintained, there is insufficient evidence to show that these factors contributed substantially to the disaster.

6. A feeder is a larger wooden box with a funnel-like opening at its base which is built into a hatch. Captain Bishop testified that "the feeder is similar to a hop-

op, Executive Vice-President of the National Cargo Bureau, and Maurice De Leone, a naval architect, testified as to the possible shifting of the grain cargo. Captain Bishop testified that the Coast Guard regulations in effect in December 1964 were based on bulk cargo standards recommended by the Safety of Life at Sea Convention of 1960 (the SOLAS standards). The SOLAS standards and the Coast Guard regulations permitted the elimination of the centerline boards in and below feeders on vessels loaded in accordance with Coast Guard stability requirements. The elimination was based on the assumption that there was an overall settling of 2% of grain after it had been loaded. Between 1960 and 1964, the National Cargo Bureau became concerned by the fact that a number of grain ships had sunk and others came into port with severe lists.[7] Tests were made to determine to what extent grain cargoes had shifted during the course of voyages, which indicated that the assumed 2% overall settling was incorrect. On the basis of these studies, the National Cargo Bureau concluded that no matter how carefully a grain vessel was loaded, an estimated average void space of some 18 inches would exist in each loading compartment. By reason of the void space, the possibility of the cargo shifting was increased by the absence of centerline boards in the feeders. The studies indicated that in rough weather, where the cargo shifted, it would shift predominantly to one side, the vessel taking on perhaps a 10 degree list initially. As the vessel continued to roll, the list would increase to a point of danger. As Captain Bishop pointed out, the deeper the vessel is in the water, the greater the danger presented by the list.

Mr. De Leone testified that the shifting of the grain on the VOYAGER, absent the centerline boards, could have been responsible for the disaster. However, instead of using Captain Bishop's 18-inch void space figure, Mr. De Leone used an assumed 24-inch void space in his computations, which figure was furnished him by petitioners' attorneys. Presumably because of the larger void space figure, Mr. De Leone computed an initial list of 16 degrees instead of the 10 degrees list to which Captain Bishop had testified. Chief Mate Bennett had previously testified that when the vessel lost power because of the broken steampipe on December 20, she came to lie "broadside to the wind and the sea in the trough of the swell, [with] the amplitude of [her] roll * * * considerably quickened and extended." At this point, in Mr. De Leone's opinion, the grain, by reason of the void space, shifted to the starboard side of the vessel, causing a 16 degree list to starboard. The weight of the grain, according to Mr. De Leone, caused the feeders to collapse, causing an additional list of 4–5 degrees, increasing the list to 20 degrees to starboard, with rolling up to 40 degrees.[8] Mr. De Leone calculated (assuming the vessel was 3¾ inches below her marks) that when she listed to 16 degrees, her freeboard was reduced to 1

---

per" and that "in the event of any settlement [in the compartment below the feeder] . . . the grain [in the feeder] would feed down and fill in the spaces below."

Centerline boards in the feeders would be wooden boards of a minimum thickness of 2 inches which would divide the feeders, bow to stern, to prevent the lateral shifting of the grain in the feeders.

7. Captain Bishop testified that between 1960 and 1964 seven ships which had been loaded in accordance with the SOLAS standards had sunk, one of which, the VOYAGER, was an American flag ship.

8. There was evidence that, at some point, the grain cargo shifted. At about 1:00 or 1:15 p. m. on December 20, the Captain and the Chief Mate observed a large bulge about 10 feet in diameter on the starboard side of the tarpaulin covering the wooden hatch cover on the #4 Hatch. (The Captain said he thought the bulge was due to a leak.) When the vessel was inspected 4 or 5 days later, another smaller bulge in the center of the tarpaulin on the #4 Hatch was observed, and the feeders in the #2 and #3 holds had collapsed, the grain having shifted to the starboard.

foot 2 inches on the starboard side, and when she listed to 20 degrees, her starboard deck became submerged.

The court cannot subscribe to Mr. De Leone's conclusions because they are based on a 24-inch void space and because the court finds that at noon on December 20 the vessel was approximately 19 inches below her marks and not 3¾ inches below her marks. Indeed, the testimony of Captain Bishop and Mr. De Leone emphasizes that the list due to the absence of centerline boards in the feeders would be particularly dangerous where the vessel is overloaded because of the loss of freeboard.

Captain William Ash, who testified as an expert for the claimants, expressed the opinion that the overloading of the vessel had caused the disaster by reducing the vessel's "reserve buoyancy," causing the vessel's deck to become submerged that much sooner. Captain Ash testified that on December 20, by reason of the overloading, the VOYAGER was a "stiff" ship, which rolls more violently than an "easy" or "tender" ship and which would cause the grain to shift more rapidly. The extent to which the VOYAGER was below her marks, according to Captain Ash, "would have a very great bearing on how long [the vessel] took to submerge." Her starboard deck submerged sooner by reason of the overloading, and once it submerged, the vessel had reached the end of her range of stability and had begun to founder.

This occurred between 12:30 and 1:15 p. m. on December 20.[9]

From the foregoing, it is clear that the overloading was a substantial cause of the disaster. The VOYAGER was overloaded, and hence, unseaworthy from the time she broke ground at Houston, The Vestris, 60 F.2d 273 (S.D.N.Y.1932), see The Indien, 71 F.2d 752 (9th Cir. 1934). Indeed, the evidence shows that had she not been overloaded, her starboard deck would not have been submerged on December 20. In such event, there would have been no reason for panic or for the crew to leave. On the contrary, since the broken steampipe had been repaired, the vessel could have gotten underway and headed into the wind, and her pumps could have been used to pump out the water taken aboard. Had this happened, the disaster would have been avoided.

■ Since the VOYAGER was overloaded when she left Houston, petitioners violated the United States Load Line Act, 46 U.S.C. § 81 et seq. and regulations promulgated thereunder. Because of this violation, the petitioners have the burden of showing the overloading "not merely * * * might not have been one of the causes, or that it probably was not, but that it could not have been" one of the causes of the disaster. The Pennsylvania, 19 Wall. 125, 136, 86 U.S. 125, 136, 22 L.Ed. 148 (1873). If petitioners do not show that the overloading could not have caused the

9. Mr. De Leone, on rebuttal, stated that the vessel would reach the end of its range of stability only at the point at which the righting arm, or the measure of the vessel's ability to right itself, was zero, and that that condition would occur when the vessel was at an angle of 72 degrees; he also stated that the vessel would capsize somewhat before that, at an angle of 66 degrees. It appears that while Captain Ash was testifying as to the practical effect of the deck's going under water with a permanent list, and stated that at this point the vessel had begun to founder, Mr. De Leone was testifying as to the theoretical point at which the vessel would lose its ability to right itself and would capsize. With respect to the situation of the VOYAGER on December 20, it is more important to know when she had begun to founder, than the theoretical point as to when she might capsize. Mr. Le Leone appeared to agree with Captain Ash when he stated that, when the deck became submerged at about a 16-degree list, "the effect of [the] permanent list [would be that] the deck will not come out of the water." He also stated that, although "according to all logic and engineering the ship is not in danger," "if [he] was on the ship and her deck was below the water line, [he] would be scared stiff."

disaster, "it is presumed that the [statutory] fault is a contributory cause * * *." The New York Marine No. 10, 109 F.2d 564, 566 (2d Cir. 1940). See also, Commercial Transport Corp. v. Martin Oil Service, Inc., 374 F.2d 813, 819 (7th Cir. 1967); The Denali, 105 F.2d 413 (9th Cir. 1939); Andros Shipping Co. v. Panama Canal Co., 184 F. Supp. 246 (D.C.Canal Zone 1960).

The petitioners have not met their burden and the court has found that the statutory fault, the overloading, was a substantial cause of the disaster. Therefore, petitioners are not entitled to exoneration. Petition of Moore-McCormack Lines, Inc., supra, 147 F.Supp. at 820.

■ To be entitled to limitation of liability, the petitioners had the burden of proving that the overloading was without their privity or knowledge (46 U.S.C. § 183(a)). This, they have failed to do. Petitioner Smith, through its Vice-President Fitzsimmons, was aware of the possibility of overloading and, indeed, cautioned the Captain to arrive at the lightening ports in India on its marks so as to avoid a fine for overloading (as had happened to another vessel under the Smith agency). Presumably the vessel would arrive at the lightening ports low on fuel and water, and this evidence demonstrates a reckless disregard of Smith as to whether the vessel would be overloaded during its winter crossing of the Atlantic. Moreover, it was Smith, through Fitzsimmons, which insisted that the vessel carry at least 10,200 tons of grain. This insistence and disregard of the consequences constituted privity and knowledge as to the overloading and consequent unseaworthiness of the vessel.[10] Negligent failure to discover unseaworthiness has been held sufficient to constitute privity or knowledge. McNeil v. Lehigh Valley R. R. Co., 387 F.2d 623 (2d Cir. 1967), cert. denied sub nom., Lehigh Valley R. R. Co. v. Wm. Spencer & Son Co., 390 U.S. 1040, 88 S.Ct. 1638, 20 L.Ed.2d 302 (1968); see Avera v. Florida Towing Corp., 322 F.2d 155 (5th Cir. 1963). Here, petitioner Smith was more than negligent. It showed a reckless disregard as to whether the VOYAGER went to sea overloaded and, hence, in an unseaworthy condition.

■ Captain Mohle also knew or should have known that the VOYAGER was overloaded and unseaworthy when she broke ground at Houston, and his knowledge is also imputable to the petitioners (46 U.S.C. § 183(e)). While the evidence shows that in Houston the Captain indicated concern to Fitzsimmons, petitioner Smith's Vice-President, that the vessel might become overloaded if it took on the amount of grain which it had been directed to load, he was satisfied to accept the advice from Fitzsimmons that if he could not take on the fuel and water necessary for the voyage from Freeport to Ceuta, he could put into the Azores, and Fitzsimmons gave him the names of the agents whom he should contact. Despite this initial concern, the Captain made no effort to determine whether the vessel was overloaded when she left Houston. There was evidence that the cargo certificate was issued before the vessel had completed loading and that the cargo inspector made no check of the vessel's marks.[11]

■ Fitzsimmons was Vice-President of both Smith, the General Agent, and Quinn, the charterer. Smith was Quinn's

10. As Vice-President of Smith, in charge of loading, Fitzsimmons' knowledge of the overloading is imputable to Smith, see Petition of Kinsman Transit Co., 338 F.2d 708, 715 (2d Cir. 1964), cert. denied sub nom. Continental Grain Co. v. City of Buffalo, 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965); see also Petition of United States Dredging Corp., 225 F.Supp. 730 (E.D.N.Y.1964). Therefore, with respect to Smith, the cargo claimant and the individual claimants are in the same position notwithstanding Section 183(e).

11. As has been previously noted, before sailing from Houston the Captain failed to report the grounding in Houston Channel to the Coast Guard, and failed to make any examination for possible structural damage to the vessel by reason thereof.

exclusive agent in the management of Quinn's chartered vessels, including the VOYAGER. Both Smith and Quinn operated out of the same New York office and had common officers. Under these circumstances, Smith's knowledge of the overloading was imputable to Quinn. Petition of United States, 105 F.Supp. 353 (S.D.N.Y.1952), remanded on other grounds sub nom. Petition of Isbrandtsen Co., 201 F.2d 281 (2d Cir. 1953); The New York Marine No. 10, 25 F.Supp. 847 (S.D.N.Y.1938), aff'd, 109 F.2d 564 (2d Cir. 1940); The James Horan, 10 F.Supp. 28 (D.N.J.), aff'd, 78 F.2d 870 (3d Cir.), cert. denied sub nom. Warner-Quinlan Co. v. Swan-Finch Oil Corp., 296 U.S. 621, 56 S.Ct. 142, 80 L.Ed. 441 (1935); see 46 U.S.C. § 183(e).

As to petitioner Long, the owner, there was no evidence at the trial that he participated in the loading arrangements or that he had knowledge of the overloading of the VOYAGER. The bareboat charter between Long and Quinn, dated March 23, 1962, provided that subject to certain exceptions not here relevant, "the Charterer [Quinn] and not the Owner [Long] shall have exclusive possession, control and command of the Vessel during the entire period of use under the Charter."

On the other hand, no distinction between the petitioners was made in the pleadings or in the course of the trial, and therefore petitioner Long has failed to prove lack of privity and knowledge of the overloading.

For the foregoing reasons, the petition for exoneration from or limitation of liability must be denied.

The foregoing constitutes the court's findings of fact and conclusions of law, Rule 52(a), Federal Rules of Civil Procedure.

An interlocutory order will be entered denying the petition for exoneration or limitation of liability. The parties will also settle an order to provide for hearing on and adjudication of the several claims.

Settle orders on notice.