439 F.2d 109
 Petition of Sumner A. LONG, Owner and Anne Quinn
Corporation, Charterer, and Earl J. Smith & Co.,
Inc., Agent of the S/S SMITH VOYAGER,
for Exoneration From
or Limitation of Liability. Sumner A. Long, Anne Quinn
Corporation, and Earl J. Smith & Co., Inc., Appellants.
 Nos. 1, 2, 3, Dockets 33248, 33249 and 33250.
 United States Court of Appeals, Second circuit.
 Argued Jan. 18, 1971.
Decided March 3, 1971.
 
 Edwin K. Reid, New York City (Zock, Petrie, Sheneman & Reid, Howard M. McCormack, and John R. Sheneman, New York City, on the brief), for appellants Anne Quinn Corp. and Earl J. Smith & Co., Inc.
 Robert E. Meshel, New York City (Baker, Nelson, Williams & Mitchell and O. Taft Nelson, New York City, on the brief), for claimant-appellee India Supply Mission.
 Davis & Davis, New York City, on the brief, for appellee Anna J. Veenstra.
 Abraham E. Freedman, New York City (Marvin I. Barish, Philadelphia, Pa., on the brief), for Thirty-Three Claimants-Appellees.
 Burke & Parsons, Raymond J. Burke, and Thomas A. Dillon, Jr., New York City, on the brief of American Maritime Association, American Institute of Merchant Shipping, American Tramp Shipowners Association and Committee of American Tanker Owners, as amici curiae.
 Before HAYS and ANDERSON, Circuit Judges, and TYLER, District Judge.*
 ANDERSON, Circuit Judge:
 
 
 1
 The Anne Quinn Corporation, demise charterer of the steamer SMITH VOYAGER, and the vessel's agent, Earl J. Smith & Co., Inc., appeal from the denial of their petition pursuant to the Limitation of Liability Act, 46 U.S.C. 181 et seq., for exoneration from, or limitation of, liability for the loss of life and cargo when the SMITH VOYAGER foundered and sank in the North Atlantic on December 20-27, 1964. Thirty-one members of the crew, the personal representatives of the estates of four crew members lost during the rescue, and the owner of the cargo filed claims totalling $16,000,000 against Sumner A. Long, the registered owner of the vessel, its charterer and agent. The district court denied the defendants' petition and ordered the claimants to proceed to the adjudication of the amount of each claimant's damages. Petition of Long, 293 F.Supp. 172 (S.D.N.Y.1968); 295 F.Supp. 857 (S.D.N.Y.1968). Shortly before oral argument of this appeal, Sumner A. Long agreed to pay the claimants $1,821,000 in settlement of their claims against him.[1] The issues presented are whether the charterer and agent have proven the SMITH VOYAGER'S seaworthiness and are, therefore, entitled to exoneration, and whether, if the vessel was unseaworthy, the defendants may limit their liability for either the cargo or the loss of life.
 
 
 2
 In March, 1962, Sumner A. Long purchased the Victory ship P & T VOYAGER and simultaneously delivered her to the Anne Quinn Corporation (Quinn) under a bareboat charter for a period of five years. This charter provided that the vessel should be renamed the SMITH VOYAGER and required the charterer to 'man, victual, navigate (and) supply' the vessel during the period of the charter.[2] The business of the vessel was conducted by Earl J. Smith & Co., Inc. (Smith) under an agency agreement between Quinn and Smith.[3]
 
 
 3
 On October 30, 1964, Quinn chartered the SMITH VOYAGER to the India Supply Mission for a single voyage from Houston to India. John Fitzsimmons, the Vice President and Operations Manager of both Quinn and Smith, prepared the instructions for this voyage. In accordance with these instructions, the SMITH VOYAGER sailed from Houston on December 12, 1964 with a cargo of 10,204 long tons of wheat. She called at Freeport, Grand Bahama Island, on December 15, 1964 and there took on additional fuel and water for the crossing to Ceuta, Spanish Morocco. On the morning of December 20, 1964 the vessel encountered winds of force 6-8 on the Beaufort Scale and 20' to 30' seas. Just before noon the main steamline broke and the engine room had to be secured for repairs. As the SMITH VOYAGER lay broadside to the wind and sea, her roll quickened and described a greater and greater arc. She then developed a starboard list. After the steamline had been repaired but before the vessel got under way, the SMITH VOYAGER had a permanent starboard list of 30 degrees to 35 degrees and her main deck rail was under water. The general alarm sounded at 1320 hours and all but the captain and three crew members abandoned the vessel in a lifeboat. Four members of the crew drowned when the lifeboat capsized. The captain and crew members who remained aboard were subsequently taken off, and the SMITH VOYAGER was taken in tow by salvage tugs. The vessel continued to take on water and on December 27, 1964 she sank by the stern.
 
 
 4
 The claimants predicated defendants' liability upon the doctrines of unseaworthiness and statutory fault.[4] In seeking exoneration from liability petitioners were required to prove that the disaster was not attributable to the unseaworthiness of the vessel. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 109-112, 62 S.Ct. 156, 86 L.Ed. 89 (1941); In re American Dredging Co., 235 F.2d 618, 619 (3 Cir.), rev'd on other grounds sub nom, Kernan v. American Dredging Co., 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958). At the trial petitioners sought to prove that the SMITH VOYAGER'S instability was caused by the shifting of the grain cargo. This shifting, petitioners contended, was not attributable to their negligence but to Coast Guard regulations which did not require centerline boards in the grain feeders. To buttress their explanation petitioners introduced the testimony of an executive of the National Cargo Bureau and a naval architect. These experts testified that the settling of a properly stowed grain cargo created a void at the top of the hold, that in rough weather the absence of centerboards could permit the cargo to shift, causing a list of 10 degrees to 16 degrees, and that the weight of the shifting grain could force the feeders to give way, thereby increasing the list.
 
 
 5
 The district court, however, held, with ample supporting evidence, that the SMITH VOYAGER was unseaworthy because she was overloaded when she broke ground at Houston, when she left Freeport, and when she foundered at sea, and that this overloading was a substantial cause of the disaster. There was also evidence that the SMITH VOYAGER'S evaporators and boilers were inoperative for much of the voyage; and a leak in the rudder stock gland permitted sea water to enter the steering room which the crew drained off by making a hole in one of the bulkheads, permitting the water to go lower in the interior of the ship.[5]
 
 
 6
 The SMITH VOYAGER was a steamscrew freighter of a gross tonnage of 7,606 tons. She had an overall length of 445' 3'; a beam of 62' 1'; a deadweight tonnage of 10,720 tons; and a net tonnage of 4,549 tons. At her permissible mean summer saltwater draft of 28' 6.75' she had a displacement of 15,199 tons.[6]
 
 
 7
 On breaking ground at Houston, the SMITH VOYAGER carried:[7]
 
 
 8
 cargo ............. 10,204 tons
 fuel and water ....... 274
 crew stores .......... 100
 permanent stores
 and fittings ....... 135
 ------
 10,713 tons deadweight
The ship (light) ....... 4,479
 ------
 15,192 tons displacement
 
 
 9
 When her draft is computed by displacement the SMITH VOYAGER was on her marks leaving Houston. The displacement computation is reinforced by the testimony of Chief Mate Bennett and Captain Derrick, the grain elevator surveyor. Bennett and Derrick measured the freeboard when loading was complete and found the SMITH VOYAGER had a mean draft of 29' 1' in the brackish fresh water at dockside. Adjusting this draft by a 6' fresh water allowance, the saltwater line coincided with the vessel's loadline. The district court did not rely upon these computations but looked instead to the SMITH VOYAGER'S port log which the master sent to Smith after the SMITH VOYAGER departed Houston and to the telegram sent to Smith, at the time the vessel sailed, by its loading agent in Houston. Both record a mean draft of 29' 7' in fresh water or 29' 1' in salt water,[8] which pur the waterline six inches above the SMITH VOYAGER'S Plimsoll mark in the fresh water. It appears that the information from the log and the telegram were either inaccurate or not applicable to the matter of the vessel's actual loadline.
 
 
 10
 We do not find it necessary to reconcile this contradictory evidence, however, because the SMITH VOYAGER was, in light of subsequent events, overloaded by either calculation when she departed Houston. Fitzsimmons' letter of instruction directed the master of the SMITH VOYAGER, Captain Mohle, to load 10,200 tons of grain at Houston, to proceed to Freeport and there to take on sufficient fuel and water for the crossing to Ceuta.[9] The SMITH VOYAGER took on an additional 816 tons of fuel and water at Freeport and sailed carrying:
 
 
 11
 cargo .................. 10,204 tons
fuel and water[10] ..... 845
crew stores ............... 100
permanent stores
 and fittings ............ 135
 ------
 11,284 tons deadweight
The ship (light) ........ 4,479
 ------
 15,763 tons displacement
 
 
 12
 The SMITH VOYAGER on her departure from Freeport was, then, overloaded by some 564 tons; she had a mean draft of approximately 29' 5' and a reduction of freeboard of approximately ten inches. In order to depart Freeport on her marks, carrying 845 tons of fuel and water, the SMITH VOYAGER could have stowed only 9,640 tons of cargo at Houston. By the same displacement computation, the SMITH VOYAGER was 209 tons overloaded on December 20, 1964, with the waterline approximately four inches above her Plimsoll mark.
 
 
 13
 The overloading of the SMITH VOYAGER made her an unseaworthy vessel. Ionian Steamship Co. v. United Distillers of America, Inc., 236 F.2d 78, 81 (5 Cir. 1956); The Indien, 71 F.2d 752, 759-762 (9 Cir. 1934); The Vestris, 60 F.2d 273 (S.D.N.Y.1932). Moreover, there was substantial evidence to support the trial court's conclusion that the unseaworthiness was a contributing cause of the disaster. Captain Ash, claimants' expert, testified that overloading adversely affected the stability of the vessel in two ways. First, it reduced the vessel's freeboard, thereby decreasing the angle of inclination to which the vessel could roll before her main deck became permanently partially submerged and she lost her ability to right herself. Second, overloading 'stiffened' the SMITH VOYAGER, causing her to roll more rapidly from one side to the other. The quickening of the vessel's roll accelerated the shifting of the cargo and also more closely synchronized the roll with the waves which increased the external listing pressures. By decreasing the SMITH VOYAGER'S range of stability and increasing the internal and external pressures, the overloading caused the vessel's starboard rail on the main deck to become permanently submerged more rapidly than would have been the case if the vessel had been on her marks. The time lost proved critical, for, if the starboard deck had not rapidly submerged, there would have been no need for the abandonment of the vessel. Instead it is likely she could have gotten underway and averted the disaster.
 
 
 14
 Alternatively, because the SMITH VOYAGER 'proceeded to sea from (a) foreign port' in violation of the Load Line Act, 46 U.S.C. 85(b) and (c), the petitioners were entitled to exoneration only if they proved that this statutory fault could not have been a contributing cause of the disaster. The Pennsylvania, 86 U.S. 125, 136, 22 L.Ed. 148 (1873); The New York Marine No. 10, 109 F.2d 564, 566 (2 Cir. 1940). Petitioners did not meet this burden. On the contrary, their evidence that the SMITH VOYAGER'S list was attributable in part to the shifting cargo only pointed up the danger of any reduction of the vessel's freeboard. The district court properly denied the petition for exoneration.
 
 
 15
 To limit their liability for loss of cargo, the Quinn and Smith corporations were required to prove that the overloading was accomplished without their 'privity or knowledge'; and limitation of liability for loss of life and personal injuries required proof that neither the ship's master nor the charterer's managing agent had knowledge of the overloading prior to the commencement of the voyage. 46 U.S.C. 183(a) and (e). The testimony of Fitzsimmons was sufficient to warrant the trial court's finding that there was privity in and knowledge of the overloading of the vessel by both Smith and Quinn and its holding that they were not entitled to limitation of liability under either subsection (a) or (e). In his letter of instructions to the SMITH VOYAGER'S master, Fitzsimmons stated: 'As we are declaring a quantity of 10,200 long tons of bulk wheat, we ask that you do your utmost in conjunction with the agents and the stevedores to load this declared quantity.' After delivering these instructions, but before commencement of the voyage, Fitzsimmons prepared the stability calculations necessary to obtain a cargo certificate from the National Cargo Bureau. By his own calculations he determined that the SMITH VOYAGER could not lawfully carry more than 10,127 tons to cargo and the fuel and water required for steaming between the bunkering ports. On cross-examination Fitzsimmons conceded that on the basis of past experience he knew that the SMITH VOYAGER could not carry 10,200 tons of cargo from Freeport to Ceuta without being overloaded. Fitzsimmons' knowledge of the overloading was a sufficient basis to deny limitation of liability for the loss of life and personal injury. And, as a corporate officer and manager of the vessel's operations, Fitzsimmons was 'sufficiently high in the managerial hierarchy of the appellant so that (his) general and detailed knowledge and (his) close privity to the (overloading) was imputed to the corporation(s).' Federazione Italiana Dei Corsorzi Agrari v. Mandask Compania De Vapores, S.A. (THE PERMA), 388 F.2d 434, 439 n. 6 (2 Cir. 1968); see MooreMcCormack Lines, Inc. v. Armco Steel Corp., 272 F.2d 873, 876 (2 Cir.), cert. denied, 362 U.S. 990, 80 S.Ct. 1079, 4 L.Ed.2d 1023 (1960); Waterman Steamship Corp. v. Gay Cottons, 414 F.2d 724, 731 (9 Cir. 1969); China Union Lines Ltd. v. A. O. Andersen & Co., 364 F.2d 769, 787 (5 Cir.), cert. denied, 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967); Gilmore & Black, The Law of Admiralty 10-24. Limitation of liability for loss of cargo was properly denied.
 
 
 16
 We have considered the other points raised and conclude that they do not have sufficient substance to constitute reversible error. The judgment of the district court on the issue of liability is affirmed and the case is remanded for the disposition of claims for damage.
 
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 Sumner A. Long's appeal was withdrawn subject to the approval by the district court of the stipulation of settlement
 
 
 [2]
 Although 46 U.S.C. 183(a) refers to the limitation of liability by 'the owner of any vessel,' 46 U.S.C. 186 provides that a charterer who shall 'man, victual and navigate' a vessel 'at his own expense, or by his own procurement' shall be deemed to be an owner within the meaning of the Act. Quinn, the bareboat charterer, petitioned for exoneration as an owner; Smith petitioned as the agent for the charterer. See Gilmore & Black, The Law of Admiralty 10-10
 
 
 [3]
 Anne Quinn Corporation and Earl J. Smith & Co., Inc. are wholly owned by Earl J. Smith
 
 
 [4]
 The survivors sought to recover damages for personal injuries allegedly caused by the negligence of the defendants and the unseaworthiness of the vessel. See Jones Act, 46 U.S.C. 688; Pacific S.S. Co. v. Peterson, 278 U.S. 130, 137-138, 49 S.Ct. 75, 73 L.Ed. 220 (1938); Balado v. Lykes Bros. S.S. Co., 179 F.2d 943 (2 Cir. 1950); Gilmore & Black 6-20-6-26. The personal representatives alleged decedents' deaths were caused by the 'wrongful act, neglect or default' of the defendants. Death on the High Seas Act, 46 U.S.C. 761-768; Gilmore & Black 6-29-6-33. The cargo claim was premised upon the alleged 'want of due diligence on the part of the carrier to make the vessel seaworthy.' Carriage of Goods by Sea Act, 46 U.S.C. 1303(1) and 1304(1). Although pleading both negligence and unseaworthiness as bases for the defendants' liability, the claimants proceeded at trial on the theory that overloading created an unseaworthy condition which may have been caused by defendants' negligence. As the Supreme Court recently emphasized, unseaworthiness and negligence are independent predicates for liability. A finding that negligence was the cause of the overloading was not, therefore, a prerequisite to recovery based on unseaworthiness. Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971); Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94, 66 S.Ct. 872, 90 L.Ed. 1099 (1946)
 
 
 [5]
 Because we find that overloading was a substantial cause of the sinking, we do not decide whether this defective equipment also rendered the vessel unseaworthy
 
 
 [6]
 All weight tonnage specifications refer to long tons of 2240 pounds
 
 
 [7]
 The tonnage of cargo, fuel and water is set out in a telegram from Smith's loading agent in Houston to Smith's New York office; the crew stores are presumed to weigh the same as those aboard other Gulf Coast to India passages by the SMITH VOYAGER. The brief for the appellants, Quinn and Smith, at page 22 specifies the weight of the permanent stores and fittings
 
 
 [8]
 The pilot aboard the SMITH VOYAGER when she sailed December 12, 1964 testified that Captain Mohle gave him a card indicating the vessel had a draft in fresh water of 30' 2'. This was not, however, a mean draft but rather the draft at the after end of the keel, or the deepest part of the vessel. Because the stern draft of the vessel was ordinarily at least 18' lower than the draft forward, this evidence does not necessarily indicate, as the district court thought it did, that the mean draft was larger than the permissible summer saltwater draft
 
 
 [9]
 The vessel's master asked Fitzsimmons to arrange a contingency bunkering for the Azores in the event the SMITH VOYAGER could not take aboard sufficient fuel and water in Freeport for the crossing to Ceuta. The voyage instructions were not altered, however, and Captain Mohle's telegram on leaving Freeport indicated that he was proceeding to Ceuta as directed
 
 
 [10]
 The SMITH VOYAGER consumed 210 tons of fuel and water between Houston and Freeport and approximately 35 tons of fuel and water while in port. She had 29 tons of fuel and water in her tanks before taking on an additional 816 tons