ANNE QUINN CORP. and Earl J. Smith & Co., Inc., a/k/a U. S. Bulk Carriers, Inc., Plaintiffs,

v.

AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, Defendant.

No. 71 Civ. 2924.

United States District Court, S. D. New York.

Dec. 14, 1973.

Zock, Petrie, Sheneman & Reid, New York City, for plaintiffs Anne Quinn Corp. and Earl J. Smith & Co., Inc.; Edwin K. Reid, New York City, of counsel.

Freedman, Borowsky & Lorry, Philadelphia, Pa., for 34 Personal Injury and Death Claimants; Marvin I. Barish, and Sanford I. Jablon, Philadelphia, Pa., of counsel.

Davis & Davis, New York City, for A. Veenstra.

Baker, Nelson & Williams, New York City, for India Supply Mission; O. Taft Nelson, and Robert E. Meshel, New York City, of counsel.

Thacher, Proffitt & Wood, New York City, for defendant; Edward C. Kalaidjian, Robert G. Maas, New York City, of counsel.

## OPINION

BONSAL, District Judge.

This suit in admiralty for a declaratory judgment seeking to recover on Ocean Marine Policy No. DE 3540 ("the Policy") issued by defendant American Manufacturers Mutual Insurance Company [1] on August 18, 1964 to plaintiffs Anne Quinn Corporation ("Quinn") and Earl J. Smith & Company ("Smith")[2] was tried without a jury.

Quinn was the bareboat charterer of the S.S. SMITH VOYAGER ("VOYAGER"), which foundered and sank in the Atlantic Ocean in December of 1964, while the Policy was in effect. Smith was the general agent of Quinn. Thirty-six claims were filed by or on behalf of members of the crew of the VOYAGER as a result of the sinking, including four death claims and thirty-two personal injury claims ("the individual claimants"). In addition, the India Supply Mission ("the cargo claimant") filed a claim for the loss of the cargo, consisting of 10,204 tons of grain. Together, these claims total $16,000,000. Two of the individual claimants have settled their claims, for $5,000 and $30,000 respectively.[3] The remaining claimants have intervened in this action.

Ocean Marine Policy No. DE 3540 is an excess insurance or "Bumbershoot" policy [4] whereby defendant agreed to indemnify plaintiffs for all protection and indemnity risks of whatsoever nature including, but not limited to, those covered by the primary insurance policy with respect to all claims for personal injury and property damage in excess of $2,000,000 and up to $5,000,000 for each vessel covered, each accident. The term of the Policy ran from noon E.S.T. August 13, 1964 to noon E.S.T. August 13, 1965, and the annual premium was $7,500. The Policy's terms and the premium were the same as those in the previous year's policy (No. DE 1751) issued by defendant to plaintiffs.

Clause I(a) and I(b) of the Policy's exclusions provide:

"THIS POLICY SHALL NOT APPLY:—

I (a) to indemnify an Assured whose dishonesty or fraud, committed individually or in collusion with others, caused the loss for which that Assured seeks indemnity; nor

(b) to indemnify any Assured against claims based upon any intentional non-compliance with any statute or regulation unless such claim(s) be for damages occasioned by actual or alleged bodily injury (fatal or otherwise) or physical loss of, damage to, and/or loss of use of tangible property."

On October 29, 1968, this court denied the petition of Smith, Quinn, and Sumner A. Long ("Long") (the owner of the VOYAGER) for exoneration from or limitation of liability. Petition of Long,

---

1. Defendant is a New York corporation with a principal place of business at Long Grove, Illinois and is duly authorized to conduct the business of ocean marine insurance and to issue marine insurance policies in the State of New York.

2. Plaintiff Quinn is a Delaware corporation with a principal place of business at Dover, Delaware. Plaintiff Smith is a New York corporation now known as U.S. Bulk Carriers, Inc. with a principal place of business in the City of New York.

3. The claim filed by James C. Gilmore, second mate, for loss of personal effects and wages was settled for $5,000; and the claim for personal injuries and maintenance and cure, filed by Alfred Ita, a seaman aboard the VOYAGER, was settled for $30,000.

These claims were paid by Quinn, which has demanded but not received reimbursement from defendant.

4. Because basic or primary insurance is limited in respect to any one accident or occurrence to the amount insured, it is considered desirable to effect excess protection and indemnity insurance, i. e. Bumbershoot insurance. "As to losses covered by the underlying insurances, the Bumbershoot policy responds only after the limits of the underlying insurances are exhausted; as to losses not covered by other insurance, the Bumbershoot responds initially subject to the deductible specified (Tulane Law Review, Vol. 43, No. 3, p. 676)." L. Buglass, Marine Insurance and General Average in the United States, 257–58 (1973).

293 F.Supp. 172 (S.D.N.Y.1968). The court found that the VOYAGER was overloaded when she broke ground at Houston, Texas on December 12, 1964; when she departed Freeport, Grand Bahama Island on December 15; and when she sank on December 27; and that the overloading was a substantial cause of the VOYAGER's sinking. The court also found that the overloading of the VOYAGER had occurred with the privity and knowledge of Smith, Quinn, and Long.

Shortly before argument on the appeal from this court's decision, Long agreed to pay the claimants $1,821,000 in settlement of their claims against it, and Long's appeal was withdrawn subject to the approval by this court of the stipulation of settlement. On March 3, 1971, the Court of Appeals affirmed with respect to the liability of Smith and Quinn and remanded for disposition of the claims for damages. Petition of Long, 439 F.2d 109 (2d Cir. 1971). On May 21, 1971, the court approved the stipulation of settlement between Long and the 34 claimants.

The policy of the primary insurer, the London Steam-Ship Owners' Mutual Insurance Association, Ltd., was limited to $2,000,000 for each vessel, each accident.

Under its policy, the primary insurer has made payments totalling $1,987,501.58, including $1,821,000 paid with respect to personal injury, death, and cargo claims, and $166,501.58 representing payments for the repatriation of the crew, maintenance, attorneys' fees, and expenses in the limitation proceedings. The balance of $12,498.42 is being held by the primary insurer pending a final determination of all the claims, when it will be paid out to exhaust the limits of the primary policy. The individual and cargo claimants have received payments under the settlement and contend that they are entitled to additional damages to be paid out of the Policy.[5]

The complaint alleges that under the Policy, defendant is liable to the plaintiffs to take over the defense of the pending claims at its risk and expense, and, in the event that plaintiffs should be held liable, to indemnify plaintiffs up to the $5,000,000 limitation of the Policy. There is no dispute that defendant received timely notice from the plaintiffs' broker of the sinking of the VOYAGER and of the presentation of the personal injury, death, and property damage claims. The defendant associated with the plaintiffs and the primary insurer in the defense and control of the claims un-

5. SCHEDULE OF SETTLEMENTS

| CLAIMANT | SETTLEMENT FIGURE |
|---|---|
| Marcelo Arzu (formerly Cayetano) | $ 15,000 |
| Clarence Brown | 32,000 |
| Vernon Brown (Deceased) | 125,000 |
| Lester Carruth | 20,000 |
| Donald Covert | 90,000 |
| Joseph Charles | 23,000 |
| George Davis (Deceased) | 80,000 |
| Manuel Diaz | 82,500 |
| James Garcia | 30,000 |
| John Gorey | 50,000 |
| John Groskey | 17,000 |
| Buster Harris | 35,000 |
| Shedrick James | 20,000 |
| Per Johansen | 40,000 |
| Eli Jones (Deceased) | 30,000 |
| John Keeler | 24,000 |
| William Kelly | 17,500 |
| John Kraine | 70,000 |
| John Lukens | 15,000 |

| CLAIMANT | SETTLEMENT FIGURE |
|---|---|
| Herbert Malo | 45,000 |
| Melchor Marcelo | 15,000 |
| Porfirio Martinez | 17,500 |
| Connie Mc Calla | 50,000 |
| Freeman McDonald | 30,000 |
| Gilbert Ochoa | 100,000 |
| Roy Lee Perkins | 57,500 |
| Joseph Sinegal | 22,500 |
| Joseph Sonntag | 20,000 |
| Isaaih Taylor | 27,500 |
| Herbert Tenney | 27,500 |
| Paul Woodworth | 22,500 |
| James Wright | 55,000 |
| TOTAL | $1,306,000 |

SCHEDULE OF SETTLEMENTS DEALING WITH THE PARTIES NOT REPRESENTED BY FREEDMAN, BOROWSKY AND LORRY

| | |
|---|---|
| Cargo Claim | $405,000 |
| Estate of Veenstra | 110,000 |

til November 25, 1968 (after the court's determination that overloading had caused the sinking of the VOYAGER), when defendant notified Smith and Quinn that it considered the Policy to be void and tendered return of the $7,500 premium, which tender was not accepted, and the check was returned to defendant by plaintiffs on December 4, 1968.[6]

Defendant denies liability under the Policy on the following grounds: 1) that the Policy was void from its inception because the plaintiffs did not disclose at the time it was issued their alleged practice of overloading their vessels; 2) that under clause I(a) of the Policy's exclusions, the Policy does not cover plaintiffs' losses because they were caused by the plaintiffs' alleged dishonesty or fraud in overloading their vessels.

Plaintiffs contend that there was no fraud with respect to the issuance of the Policy because it was a matter of common knowledge in the marine industry that "tramp" vessels, such as the VOYAGER, engaged in the grain trade from United States gulf ports to India, would leave the gulf ports loaded to their marks with fuel to reach Caribbean bunkering ports, would then take on bunkers for the voyage across the Atlantic Ocean, and would leave the bunkering ports overloaded; plaintiffs contend that defendant knew or should have known of this practice at the time the Policy was issued. Plaintiffs also contend that the overloading of the VOYAGER, which the court found violated the United States Load Line Act, 46 U. S.C. § 85 et seq., Petition of Long, 293 F.Supp. at 177, would be, at most, an "intentional non-compliance with [a] statute" within the meaning of clause I(b) of the Policy's exclusions, entitling plaintiffs to indemnification for the personal injury and property damage claims.

█ A marine insurance contract is *uberrimae fidei,* requiring the highest degree of good faith. If the assured fails to disclose any material fact or circumstance known to him, then the policy is voidable at the instance of the insurer. See 9 G. Couch, Insurance §§ 38:74–38:82 (2d ed. 1962). However, where the means of information may be equally open to both parties, and where concerning such matters, each professes to act from his own skill and sagacity, there is no need for either to communicate to the other party matters of general knowledge known to the enlightened or mercantile community at large, including well-established customs and usages, geography and natural perils, and political and international conditions. Silence in such matters does not affect the validity of the contract. See 9 G. Couch, Insurance §§ 38:84–38:95 (2d ed. 1962). As the Supreme Court said in Clark et al. v. Manufacturers' Insurance Co., 49 U.S. (8 How.) 235, 248, 12 L.Ed. 1061 (1850):

> "[T]he insurer must be presumed to know what is material in the course of any particular trade,—its usages at home and abroad, and those transactions which are public, and equally open to the knowledge of both parties."

See also L. Buglass, Marine Insurance and General Average in the United States 14–17 (1973).

In Buck & Hedrick v. The Chesapeake Insurance Co., 26 U.S. (1 Pet.) 151, 7 L.Ed. 90 (1828), suit was instituted on two policies of insurance on cargo shipped "from the Spanish island of Porto Rico to Baltimore, *for whom it may concern.*" 26 U.S. (1 Pet.) at 157, 7 L.Ed. 90. The Court held that since the insurers ought to have been aware of the practice of neutrals covering belligerent property under neutral names, the plaintiffs suing to enforce the policies were not bound to prove that at the time of effecting the insurance they disclosed to the defendant that Spanish property was intended to be covered by the insurance, unless the insurer made

---

6. The court finds that there was no waiver of defenses to the Policy.

specific inquiry. 26 U.S. (1 Pet.) at 164, 7 L.Ed. 90. The Court quoted Lord Mansfield, in Pelly v. The Royal Exchange, etc. (1 Bur. 341):

> "[T]he insurer, at the time of underwriting, has under his consideration the nature of the voyage, and the usual manner of conducting it. And what is usually done by such a ship, with such a cargo, in such a voyage, is understood to be referred to by every policy." 26 U.S. (1 Pet.) at 160, 7 L.Ed. 90.

It developed at trial that Marine Consultants & Designers, Inc., a firm of naval architects, made a study of plaintiffs' records pertaining to the alleged overloading of thirteen of the seventeen vessels operated by the plaintiffs and covered by the policy.[7] This study disclosed that between February, 1963 and August 13, 1964 (the inception date of the policy), thirty-seven voyages were made from United States gulf ports to the Far East via Freeport, and on thirty-six of these voyages the vessels departed from Freeport overloaded. With respect to the thirty-seventh voyage, the study concluded that the vessel was "probably overloaded," though the specific records to prove it were not available. Subsequent to August 13, 1964, during the period the policy was in effect, Marine Consultants & Designers, Inc. studied nineteen voyages of plaintiffs' vessels from gulf ports to the Far East via Freeport and Ceuta. Of the nineteen voyages, there was evidence of overloading on seventeen. The court finds on the basis of this evidence that the plaintiffs did engage in the practice of overloading their vessels.

Mr. Charles Diamond, Vice President of Dyson Shipping Company, which since 1952 has handled the shipping of bulk grains from the United States to India, testified that in the period from 1962 to 1964 the Indian government was shipping "four or five or more millions of tons of grain" from the United States to India. Dyson shipping records indicate that of the approximately 160 voyages made each year to India—by vessels operated by plaintiffs as well as others—approximately 90 percent were made with loads exceeding the tonnage for which the vessel was chartered.

Captain Charles Scarpello and Captain Frank DiVenti testified that on the six or seven voyages they made from gulf ports to the Far East aboard vessels not operated by the plaintiffs, the vessels were overloaded departing Freeport. They also testified that this was a common and well-known practice for their own vessels and others they observed.

The parties stipulated that had Captain Garth Read, a marine inspector for the United States Coast Guard, testified, he would have testified that the Coast Guard was aware of the practice of overloading vessels at Freeport, but could do nothing about it because Freeport was outside of its jurisdiction.

The court finds on the basis of this evidence that the practice of overloading vessels bound for the Far East at Freeport was a common practice in the trade and was widely known.

The evidence brought out at trial also indicates that there was widespread knowledge of this practice among marine underwriters. Mr. Robert Dwelly, a marine underwriter for the Insurance Company of North America for 37 years, testified that he became aware of the practice at least as early as November 15, 1962, when he attended the regular monthly meeting of the Board of Managers of the American Hull Insurance Syndicate, during which meeting the matter was discussed. After the meeting, the minutes reporting the discussion were distributed to each of the

---

7. These records included National Cargo Bureau loading certificates showing the weights of cargoes, and radio messages, correspondence from the vessels' masters, port agents and suppliers, invoices for fuel and water, log book extracts, engineers' reports and passage reports showing the weights of fuel and fresh water furnished to the vessels at various ports of call or on board the vessels when they departed from bunkering ports.

insurance companies represented on the Board of Managers. Mr. Dwelly also testified about a book he co-authored, Touching the Adventures and Perils, the American Hull Insurance Syndicate, in which he wrote:

> "The year's [1964's] best-publicized marine disaster, though it cost the Syndicate only $446,151, was that which overtook the Victory-type American trampship Smith Voyager. En route from Houston to Indian ports fully laden with grain, this vessel had stopped at Freeport in the Bahamas, following common shipping practice, to top off her oil bunkers for the long voyage ahead. Without question (and not without precedent), she left Freeport over-laden. Five days later, in heavy mid-Atlantic weather, she was stopped by an engine breakdown, took a sharp, permanent list, and had to be abandoned, four lives being lost in the course of rescue operations by a German freighter. Taken in tow for Bermuda, she foundered on December 27. After some deliberation, the Syndicate determined to pay the total loss 'without condoning the overloading which seemed apparent in the case' and with a stipulation 'that consideration be given to an appropriate advice, presumably through marine brokers . . ., of the Syndicate's strong feeling regarding violations of safety regulations.' An ironic aspect of this casualty was that, at a Board of Managers meeting two years earlier, it had been asserted 'that there is apparently no supervision in bunkering ports such as Freeport . . . with respect to the draft of vessels taking on fuel and

water' and that 'vessels, already deeply laden with cargo on entering the bunkering port, were sailing below their marks.' It took the Smith Voyager to drive the point home." Id. at 194–95.

The evidence at trial also disclosed that information about destinations of chartered vessels and tonnages of cargoes carried, which revealed the practice of overloading, was regularly published in industry publications, to which defendant had access or subscribed.[8] In light of this evidence, the court finds that knowledge of the practice of overloading at Freeport was widespread in the industry and that the defendant knew or should have known of it.[9] See Buck & Hedrick v. The Chesapeake Insurance Co., supra, 26 U.S. (1 Pet.) at 160, 7 L.Ed. 90.

Mr. John Blackman, defendant's marine underwriting manager, testified that plaintiffs' insurance broker contacted him in early August, 1964 to request a renewal of the expiring Bumbershoot policy No. 1751. As the renewal of such policies was not automatic, Mr. Blackman asked plaintiffs' broker to submit an application for the requested coverage on defendant's standard form, a questionnaire requesting information about plaintiffs' marine and nonmarine operations, the vessels to be covered, the primary insurance to be carried, and the limits over which the requested coverage would be excess. The questionnaire, however, included no questions specifically with respect to overloading. Nor did it request information about amounts of cargo to be carried or at which ports the covered vessels would take on bunkers. The last question

---

8. The testimony brought out that the Maritime Research Service carries this information on a weekly basis. In addition, The Journal of Commerce, to which defendant subscribed, usually carries information about tonnage used in the industry. The defendant also had available Lloyd's lists showing the vessels operating in the industry, tonnages, dead weights, classifications, and other specifics of the vessels.

9. The court also notes that the defendant had insured the plaintiffs' vessels for the prior year, and that during the period from 1962 to 1964 a great number of plaintiffs' and other vessels were being operated in overloaded conditions. Because of this, the defendant had a reasonable basis for the calculation of the risks attendant upon the operation of the vessels it insured, irrespective of whether the defendant actually knew of the overloading practice.

**1318**

(# 12) merely asked the applicant to "describe any known deficiencies of insurance or any other relevant facts which might affect underwriters judgment when considering this application." Plaintiffs' broker responded: "None to our knowledge." In view of the well-known practice in the industry discussed above, this response to the questionnaire's open-ended, catch-all question was neither a misrepresentation nor a breach of the plaintiffs' duty of good faith.

■ Moreover, clause I(b) of the Policy's exclusions, which precludes the *insured* from receiving indemnity on losses *it* may have sustained as a result of its intentional noncompliance with a statute or regulation, nevertheless provides that *personal injury or property damage claimants* may recover under the Policy. The public policy reasons underlying this provision are compelling here: As between the insurer (who undertook the risk on the basis of its calculation of previous premium and loss experience, where the vessels traded, their cargo, upkeep, handling, management, and other factors relied upon by their underwriters) and the individual and cargo claimants (who were innocent of any misrepresentations or wrongdoing), the insurer should bear the risk that the insured might violate a statute or regulation which would cause a loss. As this court found, the cause of the VOYAGER's sinking was the overloading, which violated the Load Line Act, 46 U.S.C. § 85 et seq. As such, it constituted "noncompliance with [a] statute" within the meaning of clause I(b), entitling the plaintiffs to indemnification for the personal injury and property damage claims.

Accordingly, the court finds that the policy is not void and that plaintiffs are entitled to recover under it to the extent that their claims are "occasioned by actual or alleged bodily injury (fatal or otherwise) or physical loss of, damage to, and/or loss of use of tangible property."

The foregoing constitutes the court's findings of fact and conclusions of law. F.R.Civ.P. 52(a).

Settle judgment on notice.