### THE ANTHONY D. NICHOLS.

### PEDERS et al. v. HARTFORD FIRE INS. CO.

District Court, S. D. New York.

Dec. 17, 1930; Jan. 29, 1931.

928

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (E. S. Murphy, of New York City, of counsel), for libelants.

William F. Purdy, of New York City, for respondent.

CAFFEY, District Judge.

There are some interesting and close legal questions in this case. Upon several I am doubtful. Due to the considerable number of authorities cited and the lateness with which they were brought to my attention, I have not had opportunity to make up my mind finally. In consequence, I must choose between two alternatives as the method of disposing of the case. I could reserve decision and deal with it hereafter, or I can express an opinion now. I have decided to follow the latter course. Counsel must understand, however, that the present opinion is tentative. I shall take the papers with me. When I find the time I shall make a more complete and deliberate examination of the authorities. I reserve the right, after I have done that, to change the result that will follow from the impressions which I now entertain as to what is the law. This seems to me better than wholly reserving decision.

From the evidence I find these facts:

(1) The schooner was owned by the libelant Peders, and there was a mortgage on it held by the libelant Williams, as alleged in the libel.

(2) The premium of $200, as required by the terms of the policy, was paid.

(3) The insured property was destroyed by fire on February 28, 1928.

(4) This occurred at a point in the open sea four and a half miles or more off the northern coast of Yucatan.

(5) The location of the point at which the fire occurred was within the usual and ordinary lane or route followed by craft, of which the schooner was a type, in passing in the course of voyages from points on the coast of the United States to points in Cuba and other parts of the West Indies.

(6) Preceding the fire, the schooner had been into the port of Progreso, which is also on the northern coast of Yucatan.

(7) There was no concealment by the schooner or its representatives or by libelants or either of them of an intention during the life of the policy to have the schooner go to a Mexican port.

(8) The value of the property destroyed by the fire was, at the time, $20,000.

(9) There was then insurance on the schooner, issued by six other companies, for an aggregate amount of $8,000, outside of the insurance covered by the policy in suit.

(10) Proof of loss was furnished to the insurer, through its duly authorized New York agent, and this was presented on April 16, 1928.

(11) The next day, namely, April 17, 1928, on behalf and as the duly authorized representative of the insurance company, the New York agency rejected the proof of loss, returned it with the accompanying documents to the insured, and disclaimed any liability on the part of the company.

(12) In so rejecting the proof of loss and

denying liability, it was expressly stated in writing by the agency to the insured that there was nonliability because of violation of the terms of the policy through the fire having occurred outside of the limits prescribed for coverage by the terms of the policy; and no other ground for repudiating liability or refusing payment was then assigned.

(13) The proof of loss included a statement of, and was accompanied by a document which correctly described, the approximate location of the fire which resulted in the loss of the schooner.

(14) The proof of loss correctly listed other insurance on the schooner in six companies, with the amounts of the outstanding policies and the names of the companies.

(15) At the time of the fire there was on board a considerable quantity of gasoline.

(16) A surveyor named Williams was the duly authorized agent of the insurance company to conduct a survey of the schooner and report thereon to the company.

(17) Prior to the policy sued on being delivered or going into effect, the Williams survey report was furnished, and its contents were known, to the company through its duly authorized agent which was charged with the acceptance, issuance, and delivery of the policy.

(18) The survey report contained information on its face that there were on board, and as part of the equipment of the schooner, a gasoline pump and a gasoline engine.

(19) The surveyor, preceding the making of this report, knew by a visit to and examination of the schooner that there was gasoline on board and that the schooner was equipped for the carriage and use of gasoline.

(20) By reason of examination by the insurer, through its duly authorized agent, of the survey report, there was, in advance of issuance of the policy, reasonable ground for the insurance company to anticipate that in regular course the schooner would carry gasoline aboard at all times.

(21) The presence on the schooner of gasoline in the quantities disclosed by the evidence inherently increased danger of fire on, and/or if fire occurred, increased danger of destruction of or injury to, the insured property.

(22) Gasoline on board the schooner at the time of the fire was not a factor in, nor did it contribute toward, causing the fire as the result of which the schooner was destroyed.

(23) The proof of loss did not itself disclose or contain any reference to the presence on the schooner of gasoline at the time of the fire.

(24) At the time of the rejection of the proof of loss on April 17, 1928, so far as revealed by the evidence, there was no actual knowledge on the part of the insurance company and/or its representative who rejected the proof of loss that at the time of the fire there was gasoline on board the schooner.

I turn now to the law questions. I shall take them up substantially in the order in which they have been discussed by counsel.

It is quite essential, in disposing of these questions, to examine with care the precise provisions of the policy under which arise the contention as to the fire having occurred outside of the insured limits and the several defenses. The issues cannot fairly or at all be determined without bearing in mind the phraseology employed in the policy. Moreover, the decisions of the courts, federal and state, relied on by counsel, are not of consequence, unless we take into account, and their bearing cannot be determined without taking into account, the exact terms of the policies that were litigated in those cases.

On the question as to whether the fire occurred within or without the insured limits, we must pass on these words in the policy: "This policy to cover said vessel only while on inland and coastwise waters of the United States and West Indies and waters tributary thereto."

This language is very different from that used in a good many of the cases cited. It is clear from what is said in a number of those cases that they arose under policies that prescribed ports or contained descriptions of points between which voyages must occur in order to keep within coverage by the policies.

It does not seem to me that the language I have just quoted deals—and certainly it does not deal directly—with voyages. On the contrary, it very plainly defines localities at which an insured loss may occur. I think that is the unescapable interpretation of the policy. Note that it speaks of the vessel "while on" certain waters. It says that those waters are "inland and coastwise waters of the United States and West Indies and waters tributary thereto." We are bound to give effect to what, under the circumstances, the parties meant when the words "tributary thereto" were used. Did the fire occur at a time when the schooner was "on" waters which were "tributary" to those which are specified by territorial names?

■ The policy obviously was obtained by the schooner to protect it in the course of its operations. With equal certainty, the insurer committed itself to cover the vessel while on inland or coastwise waters of the United States and while on inland or coastwise waters of the West Indies, and while on waters tributary to such inland or coastwise waters. I have no sympathy with the narrow and technical way in which many courts have at times dealt with insurance policies. In ascertaining intention, I see no reason why insurance companies should be treated differently from people not engaged in insurance. Nevertheless, in construing a policy, it is only justice, as between insurer and insured, that the circumstances under which it was issued and its purpose be borne in mind just precisely as they must be taken into account when construing contracts between others where the relation is wholly apart from the subject of insurance.

■ Inasmuch as the policy used the words "while on," I reject the contention that it was contemplated that a deviation into a Mexican port—being manifestly not within either the inland or the coastwise waters of the United States or of the West Indies—the mere act of going into that port, should prevent recovery. The reasonable interpretation of the policy is that, if the fire had occurred while the schooner was inside such a port, and therefore without the waters permitted by the policy, there could be no recovery. But here the fire was not in a Mexican port. It occurred in the open sea. It was four and a half or more miles from the coast. The fact that previous to the fire the schooner had been into Progreso or into Monte de Cuyo may therefore be disregarded. It does not affect the question of liability.

As established by the testimony of a number of experts in the navigation of sailing ships, it is customary for a sailing ship going from a port on the coast of the United States to a port in Cuba or elsewhere in the West Indies quite frequently to pass exactly along waters which would include the point at which the fire occurred. Was the point, on that account, within "waters tributary" to "inland and coastwise waters of the United States and West Indies?"

■ It does not seem to me that we can properly limit the word "tributary" to what is perhaps its most frequent geographical significance. I think to consider that tributary, as here employed, is confined to a river or lake or other similar body immediately connected with another body of water of larger size would be entirely too restrictive. This policy, as in the case of all policies, was framed and issued by the insurance company. In consequence, following the ordinary rule for construing contracts, we are entitled to exercise liberality toward the insured in determining what was the intent or what was the meaning. Plainly, as it seems to me, it was a permissible meaning of the word "tributary," as here used, in the connection in which it was employed, and particularly as it deals with waters, that it included all the waters on which the vessel would ordinarily go, or which in the usual course of navigation would be traversed, in passing between waters on the coast of the United States and waters in the West Indies.

The result of what I have said is that the defense of the loss occurring outside of insured waters, whether regarded as arising under the general denials of the answer or on one of the special defenses, cannot be sustained. If that were all that is involved in the case, the libelant would be entitled to a decree.

I come next to paragraph 20 of the amended answer, setting up insufficiency of the proof of loss.

■ The language of the pleader is so general that I have been doubtful as to precisely what is the objection relied on by the respondent. However that may be, under all the authorities as I understand them—certainly on very high authority—the rejection of the proof of loss and the disclaimer of liability for a single designated reason, without including any complaint of insufficiency of the proof of loss, is a waiver or constitutes an estoppel. In the letter of April 17, 1928, Exhibit 4, the insurance company denied liability exclusively on the ground that "this loss occurred while outside the waters provided for in our policy." In consequence, I cannot uphold the defense as to insufficiency of proof of loss.

Turning now to the defense of other insurance, the facts are clear. On these facts, considering the way in which the policy is worded, but for a circumstance to which I shall soon advert, I should hold—at least I should be very strongly inclined to hold—that the defense is good.

■ The first thing that seems to me probably to differentiate the case at bar on this point from the very well-settled authorities on which the respondent relies is that in the present policy there is a coinsurance clause.

As was well recognized by both parties apparently, this is the New York standard form of policy. In addition, it is to be borne in mind that the policy was delivered in the state of New York. It seems to me, therefore, that we must give more than usual weight to the decisions of the New York courts as to the proper interpretation of the policy. It may be that this is such a general question of law that, if there were any difference between the decisions of the New York state courts and the decisions of the federal courts, we should be bound to prefer the latter. At the moment, however, there is no occasion to determine that. If we are to follow the New York decisions, I am quite impressed with the view taken by Judge Bischoff in the Catoosa Case, 18 Misc. Rep. 209, 41 N. Y. S. 377, cited by libelant. Again, applying the ordinary principles for construing contracts, if there be any repugnance between clauses in different parts of the policy or if it be doubtful of meaning or if it contain ambiguities, the insured is entitled to have the court apply any reasonable interpretation favorable to him that the wording of the policy will allow.

The coinsurance clause meant something. It certainly contemplated either that additional insurance would be taken out by the insured or else that, through failure to get additional insurance, he would put himself in position where in effect his loss would not at all be reimbursed by the policy in suit. Judge Bischoff squarely held that the inclusion of the coinsurance clause was, in and of itself, an assent, expressly embodied in the policy, to the insured carrying additional insurance. If that be a correct interpretation, then it would seem to me that, within the provision on the back of the policy, lines 32 to 37, in regard to other insurance, the coinsurance clause may properly be deemed a consent to insurance which, within the terms of the clause as to other insurance, is "otherwise provided (for) by agreement in writing."

Suppose, however, that I am wrong in this interpretation or in giving this effect to the coinsurance clause. Yet I cannot escape from the feeling that, within the well-settled authorities, the rejection of the proof of loss and the denial of liability by the insurance company after presentation of the proof of loss was a waiver of the defense as to other insurance, or, in the language of some of the cases, estopped the insurance company from setting up the defense of other insurance. The proof of loss recited, and correctly recited, the existence of all the other insurance that existed at the time of the fire. By rea-

son of that fact the insurance company, on receiving the proof of loss, had it within its province, and, if it was going to deny liability on that ground, was under the duty, to base its denial of liability definitely on that ground. In discussing waiver and estoppel, the authorities are not always consistent in their reasoning. They are not always precise in stating whether the conduct of the insurance company constitutes a waiver or constitutes estoppel. Nevertheless, the rule on the subject, so far as I have examined the authorities, is pretty nearly universal and is uniform. As expressed in one of the cases which I examined, Georgia Home Ins. Co. v. Allen, 128 Ala. 451, 30 So. 537, 539, "when one specific ground of forfeiture is urged against a policy of insurance, and the validity thereof denied on that ground alone, all other grounds are waived." Because of waiver or estoppel I feel, therefore, that I cannot sustain the defense of other insurance.

In regard to the defense of increased hazard, I fail to discover any support in the proof, unless it be based on the presence of gasoline on board the schooner, which I shall discuss in a moment in connection with another defense.

As to concealment of intention to take a voyage into Mexico, as I have already said, there are no facts which would substantiate such a defense.

Lastly, I think there is a serious question as to what is the effect of the presence on board of gasoline. The evidence satisfactorily shows that it was on board. The presentation, previous to actual issuance of the policy, of the survey to the agency handling the issuance of the policy on behalf of the company, adequately put the insurance company on notice that in ordinary course there would be gasoline on board the schooner. I see no explanation of the significance to be attached to the disclosure in the survey of the vessel being equipped with a gasoline engine and a gasoline pump except that insurer knew they were there to be used. If there to be used, that necessarily involved employment of gasoline and, in consequence, carriage of gasoline on board the ship. The testimony of Mr. Billin makes it manifest that, prior to delivery of the policy, he was entirely conscious of the equipment of the schooner with the facilities for the use of gasoline. While it is not very definite as to who, representing the brokers who were negotiating with him, had the conversation with him on the subject, it is perfectly clear that, from its own standpoint, the insurance company contemplated

at the time of the delivery of the policy that gasoline would be employed on the schooner. Moreover, the testimony of Capt. Clausen substantiates what was disclosed in the survey report. From what he says it is plain that the surveyor, before making the report, saw the supply of gasoline on board the schooner, and, if he did not, inasmuch as, for the purpose of making his survey, he went out to the vessel at Wilmington in the schooner's launch, he was bound to know that, as the launch was operated by gasoline, gasoline would be carried on board.

■ My difficulties are with respect to the extent to which these indisputable facts may be employed in the application of the doctrine of waiver or estoppel. I am inclined to think that mere knowledge of the surveyor, qua surveyor, is insufficient basis for the creation of a waiver or estoppel on the part of the company, in the absence of his having transmitted that information to the company or to its New York agency which was acting for it in issuing the policy. However, my feeling is that, at the time of the receipt of the proof of loss, the knowledge which the company had gained from the examination of the survey put on it a duty. Indeed, with the undisputed proof—produced out of the files of the company; based on the contents of the survey report itself—I am rather inclined to think that, when the company got this notice from its surveyor, and thereafter issued the policy without communicating in unequivocal form, or substantially unequivocal form, to the insured that the presence of gasoline on the schooner would avoid the policy, the course of conduct of the insurance company in that respect bars it from now setting up the defense of the presence of gasoline on board.

■ In addition, when the proof of loss came in, I do not think that, in order to constitute waiver or estoppel, through rejection of the proof of loss and denial of liability on a single assigned ground, which did not include the presence of gasoline on board, it was necessary that there be something on the subject in the proof of loss itself. It seems to me that a fair application of the doctrine, as announced by the courts, compels us to make use, as foundation for waiver or estoppel, of this knowledge that was in the hands of the insurance company at or prior to the time when it delivered the policy.

■ As I have said, I reserve the right to review your authorities before I commit myself finally to these tentatively expressed views.

If I adhere to them, the result will be that the libelant is entitled to a decree. The proof is undisputed that the proofs of loss were presented to the company on April 16, 1928. If, therefore, the libelant recover, the amount should include interest from June 16, 1928.

On the other hand, if I change my views on the law of the case, the libel should be dismissed.

Memoranda to be submitted by December 29, 1930.

Engrossment in work of the motion part has prevented me from earlier giving further consideration to this case since the briefs came in. Time is not now available for extended discussion. I shall therefore confine myself to somewhat summary comment on a few points which seem to me controlling.

While I am not wholly free from doubt, unjustifiable delay would be required for a more extended examination of the cases than I have been able to give them in an effort to solve the doubt. Indeed, lack of clearness or uniformity in numerous decisions is some excuse for a feeling of uncertainty on the part of any one who has not had the chance for prolonged study of the subject involved here.

I still think the loss was within insured limits.

Can the policy be reasonably construed to afford coverage only while the vessel was either on waters of the United States or West Indies or on waters physically connected with or flowing into waters of the United States or West Indies? Does "waters tributary thereto" include merely waters so connected or flowing?

In the first place, it will be noted that it would be difficult to conceive of waters so connected or flowing which were not already included in the description of "inland" or "coastwise" waters of the named countries. It is incontrovertible that there could be none such not already so included, under the words "inland" and "coastwise," unless they were waters which came out of some other country into one of the countries named. This is true because otherwise the words "waters tributary thereto" would be meaningless and without field of operation.

Is it a natural or probable meaning to assign to the words "waters tributary thereto" application exclusively to waters of other countries which connected with, or flowed into, waters of the United States or West Indies? Is it not more natural, as well as more probable, that it was within the contemplation of the parties that the vessel would pass

between the United States and the West Indies, and that, while so passing, the insurance would be in force? Unless that were the intention, then the result would be that, while passing, in course of usual voyages, between the named countries, the design was that the vessel should be insured part of the time and uninsured part of the time; that no insurance should exist while the vessel was at sea between, and outside the coastwise waters of, the specifically named countries.

So unnatural a result should be avoided if other interpretation be possible. It can be avoided by construing "waters tributary thereto" to embrace the usual lanes of travel for a sailing ship while at sea on voyages between the United States and the West Indies. Such an interpretation is not strained. On the contrary, it is obviously consonant with the purposes which can rationally be attributed to both parties when the policy was written.

"Tributary" is both a noun and an adjective. An illustration of its use as an adjective is in Amsbary v. City of Twin Falls, 34 Idaho, 313, 318, 319, 200 P. 723. That the policy under consideration employed it in an adjective sense is clear.

While there is some conflict in the authorities, and the significance of a particular holding cannot be determined without precise ascertainment of the provisions of the policy under examination at the time, I am persuaded that the overwhelmingly sustained view of the courts is that rejection by the respondent of the proofs of loss, coupled with a disclaimer of liability, on the sole ground that the fire occurred without insured limits, constitutes what some of the cases call a waiver and others call an estoppel, on the part of the respondent, now to defend on the ground of other insurance.

So also I am convinced, upon what I regard as the best applicable authority, that the respondent is estopped from defending on the ground that, at the time of the fire, there was gasoline on board the vessel.

The policy in terms provided that it should not be valid until countersigned by the respondent company's authorized agent at New York. It was in fact countersigned at New York by the Vessel Agency on July 14, 1927. Moreover, as will be observed, the execution of the countersignature at New York by the Vessel Agency was through Mr. Billin, its assistant manager, who was a witness at the trial.

The surveyor realized that gasoline was regularly used on board the schooner.

His report shows that. The report was dated July 11, 1927. It was in the hands of Mr. Billin preceding issuance of the policy. By that report he had full notice, as his testimony plainly establishes, that the schooner was equipped for using gasoline and would in ordinary course carry gasoline on board. Of what he had such notice, he is conclusively presumed to know. Fidelity & Deposit Co. v. Queens County Trust Co., 226 N. Y. 225, 233, 123 N. E. 370. What he knew, the company knew. With this knowledge the premium was paid and accepted by the company on September 16, 1927, some two months later.

In view of the facts in evidence, and particularly of the provision in the policy that it should go into effect only by countersignature at New York, I think its meaning is governed by the law of New York. Moreover, it seems to me, that the provision with respect to gasoline was a condition and was not a warranty.

Under the law of New York, such knowledge by the respondent, as it had through Billin as its representative, when it delivered the policy, followed by subsequent acceptance of the premium, raised an estoppel against the respondent defending on the ground that there was gasoline on board at the time of the fire. McCelland v. Mutual Life Ins. Co., 217 N. Y. 336, 111 N. E. 1062; Satz v. Massachusetts Bonding & Ins. Co., 243 N. Y. 385, 390, 153 N. E. 844, 59 A. L. R. 606.

In addition, I am inclined to the view that, with such notice at the time of the issuance of the policy, denial of liability, when the proofs of loss were presented, on a ground not including breach of the gasoline clause, constituted a waiver of the right to defend on that ground.

Libelant by brief requests additional findings that the original form of the policy was supplemented by various specified riders. I do not think the rule makes this necessary. The riders were parts of the policy, were so treated in the pleadings, and were so regarded by the parties during the course of the trial as well as in the briefs.

As I read the coinsurance clause, upon the facts in evidence, there should be no reduction below $10,000 in the amount recoverable. If, however, the parties desire further hearing on the point, they may submit memoranda or present the matter orally at a time to be arranged.

Accordingly, a decree may be taken for libelant in conformity with the tentative view I expressed at the trial.