**Ronald GOODMAN**

**v.**

**FIREMAN'S FUND INSURANCE CO. and J. A. Montgomery, Inc.**

**J. A. MONTGOMERY, INC., Third-Party Plaintiff,**

**v.**

**ASCO, LTD., Third-Party Defendant.**

**Civ. No. T–77–660.**

United States District Court, D. Maryland.

Dec. 8, 1977.

Ronald Goodman, pro se.

Francis J. Gorman and Semmes, Bowen & Semmes, Baltimore, Md., for Fireman's Fund.

John W. Scheflen, Baltimore, Md., for J. A. Montgomery, Inc.

THOMSEN, Senior District Judge.

The complaint in this case contains two counts. In the first count, Plaintiff seeks recovery against Fireman's Fund Insurance Company (Insurer) for damage to his yacht, which he alleges was covered by the terms of a "yacht policy" issued to him by Insurer. The second count, in which "recovery is sought" only in the event that the court dismisses the first count, is against J. A. Montgomery, Inc. (Montgomery), an insurance broker, alleged to be the successor of Asco, Ltd., another insurance broker, based on an alleged "misrepresentation of the Defendant Agent and the improper and wrongful conduct of its business". Montgomery has filed a third-party claim against Asco. The parties agreed that the court should hear and decide the claim against Insurer before considering the other claims.

Both Plaintiff, who is a member of the Bar, and Insurer filed motions for summary judgment, but at the hearing they agreed that the court should consider all the evidence, including testimony given by Plaintiff at the hearing, draw appropriate inferences and make findings of fact and conclusions of law with respect to the first count.

### Findings of Fact

Plaintiff owned a 55′ Chris Craft twin-diesel motor vessel which he used for private pleasure purposes. On June 2, 1976, Insurer issued a yacht policy extending coverage for one year for "hull insurance" of $56,000 with a $750 deductible, along with protection and indemnity insurance. The pertinent provisions for hull insurance were as follows:

"Coverage

"The insurance provided by this Section covers, subject to the conditions of this policy, against ALL RISKS of physical loss or damage from any external cause. Also, provided the loss or damage has not resulted from want of due diligence by the assured, the owners or managers of the vessel, and subject to the conditions of this policy, this insurance covers loss of or damage to the vessel directly caused by: explosions; breakdown of motor generators or other electrical machinery and electrical connections thereto, breakage of shafts, or any latent defect in the machinery or hull (excluding the cost and expense of replacing or repairing the defective part); negligence of masters (including owner when acting in capacity of master), mariners, engineers, pilots, or repairers provided the repairers are not an assured hereunder.

"In addition to Exclusions elsewhere herein this policy does not insure against:

"(a) Loss or damage through wear and tear, gradual deterioration, marine borers, vermin, ice and/or freezing, inherent vice, mysterious disappearance, loss of use and delay."

A special condition, typed on the front page of the policy, reads as follows:

"Layup warranty. Warranted that the said vessel shall be laid up and out of commission from October 1st, at noon, until May 1st, at noon."

Pursuant to the layup requirement, Plaintiff began "winterizing" the vessel in early September, 1976. In the preceding year, the layup work had been performed professionally; but after making inquiries as to the proper procedure, Plaintiff decided to do the work himself.

In laying-up the vessel, Plaintiff secured the yacht in its slip with mooring lines, bled the potable water system and refilled it with a non-toxic antifreeze, drained the fresh water cooling system of the engine and refilled it with an antifreeze solution, inserted antifreeze into the toilets, disconnected the radio and navigational gear, greased the batteries, and placed five heaters on board. Sometime before January 25, 1977, however, Plaintiff disconnected four of the five heaters in an effort to conserve energy.

Plaintiff did not drain the sea water cooling system, the function of which is to aid in cooling the engine. Nor did he close the port and starboard sea valves, although it is the custom in the Chesapeake Bay region to do so as part of the winterizing program. The purpose of the sea valves is to allow sea

water to enter the lines of the sea water cooling system. Each side of that system included, between the sea valves and the engine, a filter encased in a plastic cylindrical jacket. Because the sea valves remained open and the sea water lines were not bled, water remained in those filters.

On or about January 25, 1977, while moored at its slip in a marina, the yacht partially sank, causing extensive damage. The cause of the sinking is not disputed. Based primarily upon the report of a marine surveyor, who examined the interior of the hull after the vessel had been pumped out, the court finds the cause of the sinking to have been as follows:

The plastic filter jackets broke due to the freezing of the water in the filters. The breaking of the filter jackets permitted water in the sea water cooling system to flow into the hull through the broken jackets. And, because the sea valves had not been closed, water continued to enter the system through those valves and to flow through the broken jackets in such volume that the vessel sank as far as the mooring lines would permit it to sink.

The court finds that two factors combined to cause the sinking and consequent damage to the yacht: (1) Plaintiff's negligence in (a) leaving the sea valves open, and (b) in not draining the lines in the sea water cooling system, and (2) the freezing of the water in the sea water cooling system, which caused the two strainer jackets to crack.

### Discussion

1. The hull insurance provided by the policy covers, subject to the conditions stated in the policy, against all risks of physical loss or damage from any external cause. See the All Risks clause in the first two lines under the heading "Coverage", in the quotation from the policy at the beginning of the Findings of Fact, above.

One of the conditions referred to in that sentence is set out under the same heading, "Coverage", as follows:

"In addition to Exclusions elsewhere herein this policy does not insure against:

"(a) Loss or damage through . . . ice and/or freezing . . . ."

*Conclusion 1.* Therefore, so far as the freezing of the water in the sea water cooling system caused the two strainer jackets in that system to crack was a cause of the sinking, the loss or damage is excluded from coverage.

2. The first two lines under the heading "Coverage" quoted above, also required that the loss or damage result "from an external cause". The failure of Plaintiff to close the sea valves was not an external cause. It was an omission by the insured owner to perform a critical step in the winterization procedure while he was on the vessel doing the work himself.

*Conclusion 2.* Therefore, any damage caused by the failure of the owner to close the valves is not covered by the policy unless coverage is extended by the so-called Inchmaree clause.

3. The failure of older policies to cover any loss or damage caused by persons on the vessel resulted in the adoption of the Inchmaree clause, which appears as one long sentence in the quotation from the policy, set out in the Findings of Fact above, beginning with the first word "Also" in the third line after the heading "Coverage". The pertinent portions of that sentence are as follows: "Also, provided the loss or damage has not resulted from want of due diligence by the assured, the owners or managers of the vessel, and subject to the conditions of this policy, this insurance covers loss of or damage to the vessel directly caused by: . . . negligence of masters (including owner when acting in capacity of master) mariners, engineers, pilots, or repairers provided the repairers are not an assured hereunder."

Plaintiff herein relies on the words "negligence of masters (including owner acting in the capacity of master)" in the foregoing quotation. Insurer relies on the words "provided the loss or damage has not resulted from want of due diligence by the assured, the owners or managers of the vessel" and argues that the words "negligence

of masters (including owner when acting in capacity of master)" should be construed, as other cases have construed them, to mean negligence of masters or owner acting as a master in the operation of the vessel rather than in its shoreside maintenance.

■ This court has found as a fact that the failure of Plaintiff, the insured owner, to close the sea valves and bleed the sea water lines was negligent and constituted a "lack of due diligence" on his part. The loss caused thereby is clearly excluded from coverage under the Inchmaree clause, as well as the other provisions quoted above, unless coverage is provided by the words: "negligence of masters (including owner when acting in capacity of master)".

The proper construction to be given these words has been the subject of a number of cases, which have held that the provision in question was designed to insure against seagoing or operational negligence of the master (whether or not he is the owner) and to exclude from coverage damage due to the shoreside failure of the owner or his managerial staff properly to prepare or equip the vessel for the voyage or service she is about to perform. See particularly *Allen N. Spooner & Son, Inc. v. Connecticut Fire Ins. Co.*, 314 F.2d 753 (2 Cir. 1963), which discusses at some length the purpose and effect of the Inchmaree clause, citing a number of earlier cases. Id. at 757–58; *Presti v. Firemen's Insurance Co.*, 1972 A.M.C. 1220, 1225, (Cal.Super.Ct.); and *In re Leonard Majore v. Glen Falls Ins. Co., et al.*, 1973 A.M.C. 1997 (Arb. at San Francisco, confirmed by Cal.Super.Ct.),[1] which carefully discusses and distinguishes cases upon which plaintiff herein relies.

In some cases construing other kinds of "all risks" policies the issue was whether the loss resulted from a "fortuitous event". That is not the issue here, and those cases are helpful to Plaintiff only as they have held that the burden is on the Insurer in an "all risks" policy to show that the cause of the loss was a cause which was excluded by the language of the policy. In the instant case Insurer has met that burden.

*Conclusion 3.* The loss is not covered by the Inchmaree clause of the policy.

*Ultimate Conclusion.* Judgment will be entered in favor of defendant Insurer.

---

1. Although the Editor of A.M.C. noted that notice of appeal had been filed, it was evidently not pressed, since no record of any decision on appeal has been cited or found.