CONTRACTORS REALTY COMPANY,
INC., Plaintiff,

v.

INSURANCE COMPANY OF NORTH
AMERICA, Defendant.

77 Civ. 3459(MP).

United States District Court,
S. D. New York.

May 17, 1979.

Saxe, Bacon & Bolan, New York City, for plaintiff by Roy M. Cohn, and Michael J. Cacace, New York City.

Bigham, Englar, Jones & Houston, New York City, for defendant by Donald F. Connors, and George R. Daly, New York City.

## FINDINGS AND OPINION

POLLACK, District Judge.

### I.

### SUMMARY STATEMENT

In November 1972, Gene DeMatteo, through the corporation he controls, purchased a brand new pleasure yacht from Chris Craft. He bought the yacht in order to entertain business clients and his family during local excursions and longer voyages between Connecticut and Florida, and do so with the style, grace and comfort one would expect from such a yacht. And, just as one would do with a new house or automobile, DeMatteo took out all risk insurance to cover the new yacht for any harm that might befall it.

Unfortunately, the style and comfort Mr. DeMatteo thought he had bought and paid for were never realized during his time with. the yacht. Although the yacht made numerous trips along the East Coast and one to the Bahamas, it and its owner were afflicted with numerous and persistent problems, such as peeling paint, leaky windows, and malfunctioning toilets, which detracted from the yacht's appearance and the ease and convenience of its use. In addition, the boat required a regular maintenance and adjustment of its mechanical systems at a frequency which, although foreseeable in such a complex piece of machinery, was a disappointment to the plaintiff. Indeed, the yacht owner was ultimately driven to commence a lawsuit, still pending in this Court, against the manufacturers, charging breach of warranty and demanding rescission of the contract of sale.

Plaintiff's troubles did not end, however, with the maintenance and cosmetic maladies just described, for on July 3, 1976, the yacht inexplicably caught fire, burned and sank off the New Jersey coast. And although there had never been another instance of fire on the yacht and it had been fully checked out and tested by a reputable boatyard the day before, the insurer of the yacht, on advice of counsel, reversed its initial decision and assurance to plaintiff that it would pay the claim, and mounted legal defenses to plaintiff's claim which have been tried herein.

This diversity case was heard at a Bench trial on January 9, 10, and 12, 1979. The Court has made an exhaustive review of the record, has studied the legal memoranda submitted by the parties, and after due consideration thereof, finds and so decides that plaintiff is entitled to recover the amount of the insurance from the defendant, for the reasons shown hereafter.

### II.

### SPECIFIC FINDINGS OF FACT

In November 1972, the plaintiff, a Connecticut corporation, purchased a new "Roamer 68" yacht from the manufacturer, Chris Craft Corporation, through Rex Marine Center of South Norwalk, Connecticut. The cost of the yacht, named the Counterpoint, was $342,270.00, which was paid in cash and the trade-in of another yacht.

By application dated November 16, 1972,[1] plaintiff applied for "All Risks" yacht insurance with INA, the defendant. The defendant was well aware of the high quality and calibre of the builder of yachts such as the plaintiff's and accepted all risks thereunder without hesitation as a matter of course. Plaintiff applied to INA for such insurance through an insurance broker, Joseph J. O'Connell, and an INA agent, Boccaccio & Susanin, Inc., of Hartford, Connecticut. INA issued yacht policy No. YK 91490 covering the Counterpoint for one year from November 10, 1972. That policy was renewed for successive one year periods on November 10, 1973, and on November 10, 1974. The premium for each of these coverage periods was paid in timely fashion.

---

1. The original application for insurance stated that the yacht was a new, 68 foot Roamer model Chris Craft, that it had new 655-horsepower General Motors engines, and that it was equipped with a built-in carbon dioxide fire extinguisher system, a telephone, a radio direction finder, and a sonic depth finder.

During the course of its ownership of the Counterpoint plaintiff encountered various maintenance problems with the yacht. The vast majority of these problems were of a cosmetic nature, for example, peeling paint, or of a nature that impaired the vessel's function as a luxury cruiser but not its fundamental mechanical soundness, such as leaky windows and malfunctioning toilets.

Some of the problems, in addition, centered around the engines. The Counterpoint was equipped with two twelve-cylinder, turbocharged engines manufactured by the Detroit Diesel division of General Motors Corporation. The engines experienced problems with oil pressure and leaks, and the valves in the starboard engine were replaced seven or eight times. Whenever malfunctions occurred, repairs were always made promptly.

The problems with the yacht led the plaintiff to be quite disappointed in it as a luxury item and in the manufacturers' handling of the claims made under warranty. Plaintiff's displeasure focused on the cosmetic blemishes and inconveniences, because it had expected that the yacht would meet a high standard of luxury and comfort, sometimes described as "yacht condition."

Plaintiff disclosed the nature and substance of its difficulties with the yacht to defendant's agent, Ernest Susanin of Boccaccio & Susanin, Inc. Susanin knew of plaintiff's troubles, including engine malfunctions and disagreements with the manufacturer over coverage under the warranty, for some time before November 1975.

On September 30, 1975, Boccaccio & Susanin, the INA agent, requested the issuance of another renewal of the insurance from the home office. This request was handled by Ms. Frances M. McClean, an underwriter in the INA Marine Department in Hartford. On October 7, 1975, McClean requested of Michelle A. Corriveau of Boccaccio & Susanin information concerning the availability of the Counterpoint for survey by INA. On October 13, 1975, after checking with plaintiff, Corriveau wrote to McClean, stating that the yacht was either about to depart or already in transit and would be available for survey at the Brazilian Dock in Palm Beach, Florida, after November 14, 1975.

On November 5, Corriveau telephoned McClean to check on the issuance of the renewal certificate. On November 7, after receiving advice from the New York office of INA, McClean responded that the deductible had to be raised from $1,000 to $2,500 or $3,000, and offered to increase the insured value of the yacht from $300,000 to $325,000 at the option of the insured. By memorandum dated November 11, 1975, Corriveau requested that the policy be renewed at $300,000 with a $2,500 deductible.

McClean believed that she bound the defendant to agree to renew the insurance on the Counterpoint at the value of $300,000 or $325,000, at the option of the assured, on November 7. She did not, although she could have, offer rates or bind the company "subject to survey," which would have allowed INA to survey the boat at its convenience. However, she stated that she requested the information about the yacht's availability for survey so that a survey could be done if the higher valuation were chosen by the assured. Nonetheless, she quoted a rate for a value of $325,000 without reserving the right to survey. McClean never told Boccaccio & Susanin or the plaintiff that whether or not INA would cause a survey to be done depended on the choice of the face value of the policy. She said that she decided not to order a survey of the Counterpoint when plaintiff decided not to insure it at the greater value. She said there was *no other reason* for a survey except for the need to confirm an increased valuation of the yacht because it was not INA's normal practice to survey Chris Craft boats of the age of the Counterpoint.

On November 13, 1975, a new policy on the Counterpoint, No. YK 128902, was prepared by INA, with an effective date of November 10, 1975, because the office copy of the original 1972 policy was becoming "tattered." There were no substantive changes in the coverage or conditions of the new policy. The new policy was mailed to Boccaccio & Susanin on November 13, 14, or

17, 1975 for delivery to the assured's broker. On November 21st, Boccaccio & Susanin sent the policy with an invoice for the premium to O'Connell who sent the policy to Gene DeMatteo of Contractors Realty with a covering letter dated November 24, 1975. The premium on policy No. YK 128902 was timely paid by plaintiff.

The 1975 policy provided coverage for the Counterpoint from November 10, 1975 to November 10, 1976, including insurance in the amount of $300,000 for "Hull and Machinery—All Risks." Under the section headed "Warranties and General Conditions", the policy provided for a warranty that the yacht would be used solely for private pleasure purposes, that the insurance would be voided by a transfer of interest in the yacht without consent of INA, that the insured shall cooperate with INA in matters of potential liability under the policy, and for an exclusion of risks of war and nuclear accident. The only provision relating to notice by the insured to INA was as follows:

NOTICE OF LOSS  In the event of any occurrence which may result in any responsibility, claim, loss, damage or expense for which this Company is or may become liable, the Assured shall give prompt notice thereof to this Company.

Under "Section A—Hull and Machinery," the three pertinent provisions are "Coverages," "Duties of Assured," and "Exclusions":

COVERAGES  The insurance provided by this Section shall cover, subject to the exclusions and limitations named herein, afloat and ashore against all risks of direct physical loss or damage from any external cause; also to cover against physical loss or damage directly caused by explosions, bursting of boilers, breakage of shafts, or any latent defect in the Hull or Machinery (excluding, in all case, the cost of repairing, replacing or installing the defective part) providing such loss or damage has not resulted from want of due diligence by the Owners of the Yacht or by the Manager.

*　　*　　*　　*　　*　　*

DUTIES OF ASSURED  In the event of loss or misfortune insured against, it shall be the responsibility of the Assured to use all lawful and reasonable means for the safeguard and recovery of the property insured, the reasonable cost whereof this Company will pay, and the acts of either party, or their agents, in securing, preserving or recovering the property shall not be considered or held to be either a waiver or acceptance of an abandonment, or to prejudice this insurance.

*　　*　　*　　*　　*　　*

EXCLUSIONS  The insurance under Section A does not cover any loss, damage or expense arising in consequence of wear and tear, gradual deterioration, marring, denting, scratching, weathering or wilful misconduct of the Assured.

No other warranties, exclusions, or duties of the assured were expressed in the policy.

In October 1975, at about the time the 1975 renewal of the insurance was being processed, plaintiff decided to pursue its complaints against Chris Craft under the sales warranties and representations which induced the purchase of the yacht. Plaintiff engaged Robert S. Blumenstock to do a general condition survey of the Counterpoint and to render a report thereon to plaintiff which it proposed to forward to Chris Craft. Blumenstock is a surveyor of some 30 years experience, and has conducted surveys of various vessels for INA in the past. An interim report on his survey of the Counterpoint, dated October 20, 1975, was furnished to plaintiff. That report consisted of a "Preliminary List of defects" on the yacht. However, the "defects" identified by Blumenstock were found by him not to have affected the safety or seaworthiness of the yacht. Indeed, when DeMatteo inquired of Blumenstock about the import of his findings, Blumenstock assured him that the cited complaints did not pose any concern or danger for DeMatteo's family, which was then planning a trip to Florida on the yacht. Blumenstock found the hull of the yacht to be tight and staunch. Before sailing for Florida in mid-October, plaintiff had such "defects" as were identi-

fied by Blumenstock as possibly affecting the safety of the boat corrected by the Hitchcock boatyard of Bridgeport, Connecticut.

Blumenstock further explained that many of the noted "defects" were simply characteristics of the design of the boat as it came off the drawing boards at Chris Craft and represented entirely permissible preferences among boat builders. He found the installation of the yacht's wiring to be of less than optimal design; however, the installation technique employed on the Counterpoint was standard practice on stock boats and was common to 80 to 90 percent of all pleasure yachts. It was not unsafe and posed no inherent danger.

Similarly, Blumenstock found the engine room layout and the exhaust system to be poorly designed, but nonetheless common and not dangerous. Likewise, the use of dissimilar metals in the design of the boat was of little moment, as any resulting electrolysis was monitored and corrected continuously by a built-in system.

In any event, all of the foregoing findings of Mr. Blumenstock during his survey must be and are presumed to have been known to and acceptable by the defendant. As a leading underwriter in the marine field, and in particular for pleasure yachts, INA was aware of, actually and constructively, the design characteristics of each of the various models produced by a leading manufacturer such as Chris Craft.

On November 7, 1975, three days before the effective date of the 1975 insurance renewal and the very date that McClean of INA considered the company to have bound itself to a renewal, plaintiff commenced an action in this court against Chris Craft Corporation and General Motors Corporation, the manufacturer of the Counterpoint's engines. Plaintiff's complaint in that action made claim for rescission of the contract of sale and damages because, it was alleged, the yacht as delivered, and thereafter, was not safe, mechanically sound, or seaworthy within the meaning of the express and implied warranties of Chris Craft and General Motors.

Susanin was told of plaintiff's plans to sue the manufacturers of the yacht on the warranties and representations of sale, and he was aware of the suit at the time of the renewal of the policy in November 1975.

On or about March 11, 1976, Blumenstock sent his final report on the survey of the Counterpoint to plaintiff. This report simply elaborated on the findings of the preliminary report; no conditions were found affecting the soundness or safety of the yacht, albeit the in terrorem descriptions supplied for purposes of complaint used language that could be misinterpreted if not read in the context of the purchaser's purpose.

On or about June 1, 1976, the Counterpoint began the voyage from Florida, its winter anchorage, to Connecticut, its summer home. Before sailing, the yacht was sent to a boatyard for the maintenance and repairs necessary for the voyage. The yard, one of the best in Florida, spent two to four weeks putting the boat in perfect condition from bow to stern.

During the voyage, on June 8, 1976, off North Carolina, the starboard engine of the yacht overheated and seized. Using one engine, the yacht was taken to Wrightsville Marina at Wrightsville, North Carolina, for repairs. On June 16, 1976, plaintiff notified Boccaccio & Susanin and INA of the incident. It sent a Mailgram and a letter to Boccaccio & Susanin, and a copy of the letter to INA. The letter described the overheating and severe damage to the starboard engine, noted that the temperature warning system failed to operate properly, and stated that repairs were estimated to cost $10,000. Boccaccio & Susanin prepared a "Property Loss Notice" which was sent to INA, and INA acknowledged notice of the event and assigned a file number to the claim. This notification of INA about the engine overheating and seizure occurred prior to the sinking of the boat and thus before any questions arose about the extent of disclosure of "defects" to INA.

The repairs at Wrightsville were completed in about three weeks, and the Counterpoint again sailed north, with its Captain,

Charles Carlson, and his guest on board. After experiencing some difficulty with the electricity on the yacht, Carlson took the yacht into the shipyard at Norfolk, Virginia. The Norfolk yard found that an exhaust leak on the starboard engine had damaged some wiring near the engine. The yard repaired the exhaust leak and the damage it had caused, checked the yacht out fully on three test runs, and released it to Captain Carlson on July 2, 1976.

The Norfolk yard, also one of good repute, was extremely conscientious about its repairs of the Counterpoint. DeMatteo spoke to the manager of the Norfolk yard before the boat left there on the day it sank, and he was assured that the boat had been all checked out on three tests and that it was in absolutely perfect condition. Carlson oversaw the repairs while the boat was gone over 100 percent by the Norfolk yard, and accompanied the mechanics on three trial runs. He said that the Norfolk people told him, " 'You're not leaving this yard until we feel that the boat is right.' " He found the boat to be in "Fine shape" when he left the Norfolk yard. When he accepted the boat from Norfolk, Carlson signed a statement of work performed, stating that all items were "satisfactorily completed and approved."

On July 3, 1976, the yacht left Virginia bound for New York at about 5:30 A.M. At about 1:00 P.M.; while off the Delaware River, Carlson checked both engines and topped them up with oil. Sometime between 2 and 3 o'clock, Carlson's guest noticed black smoke coming out of the exhaust pipes and Carlson noticed the starboard engine begin to lose oil pressure. Carlson shut down the engines, and went to check the security control panel. When he opened the panel, black smoke began to pour out of it.

Carlson explained that the turbocharged engines on the yacht consume great quantities of air, so that any fire in the engine room would have its smoke sucked through the engines. When he shut down the engines, the smoke was no longer being consumed, so that it began to rise through the boat, and poured out when he opened the control panel.

Carlson then activated the fire extinguisher system and attempted to send an emergency signal over the radio, but it had stopped functioning. They then launched the dory as the boat became engulfed with smoke. A passing boat picked them up and radioed the Coast Guard, which arrived too late to save the Counterpoint. It burned to the waterline and sank, and has not been found or salvaged.

The Coast Guard conducted an investigation, and issued a report finding that the "proximate cause of the casualty was an engineroom fire of undetermined origin."

Plaintiff subsequently filed a Protest and Statement of Loss with defendant. Various employees of defendant indicated to plaintiff from time to time that the loss would be paid by INA, and plaintiff cooperated with defendant in developing any subrogation rights of action against third parties. However, in the course of avowedly readying the matter for payment with the suggestion that the event be used as a public relations item for INA with pictures and press releases, the matter was referred to counsel and on its advice the defendant's position changed and it declined payment of the claim on September 9, 1976.

This lawsuit followed.

### III.

### THE STANDARDS AS APPLIED

■ In order to make out a *prima facie* case for recovery, plaintiff must establish that the policy of insurance was issued, that the loss occurred, and that the loss was an event within the terms of the policy. *Navegacion Goya, S. A. v. Mutual Boiler & Machinery Insurance Co.,* 411 F.Supp. 929, 934 (S.D.N.Y.1975). There is no dispute that plaintiff has established the first two elements; defendant contends, however, that the third has not been met.

■ The policy covered "all risks of direct physical loss or damage from any external cause [or] directly caused by . . any latent defect in the Hull or Machinery." Defendant seemingly contends that a fire originating within the engine room of a

boat is not an external cause of the resulting loss. However, defendant misconstrues the meaning and intention of the "external cause" phrase.

■ The requirement of an "external cause" is intended to exclude from coverage three types of losses. First, it excludes losses due to the negligent acts of the owner or master. *See Goodman v. Fireman's Fund Insurance Co.,* 452 F.Supp. 8 (D.Md. 1977). Second, it precludes recovery for losses resulting from normal wear and tear—which is not an insurable risk, but a certainty. *See Mellon v. Federal Insurance Co.,* 14 F.2d 997 (S.D.N.Y.1926). Finally, the limitation of the policy to external causes excludes from coverage losses resulting from the internal decomposition or deterioration of the insured property.

There is no suggestion herein that the plaintiff or its employees were in any way negligent in their maintenance of the boat. On the contrary, the evidence establishes that plaintiff maintained the boat zealously. Nor can it be said that a fire that originates in the engine room and eventually consumes the vessel is an incident of normal wear and tear; the occurrence of such a fire is a risk, and not so nearly a certainty as the eventual cracking of a ship's boiler. *Cf. Mellon v. Federal Insurance Co., supra.*

The proximate cause of the loss was a fire in the engine room—not any defect in the electrical circuitry or its insulation—and such a fire is clearly an external cause within the coverage of the policy. Thus, plaintiff has established its *prima facie* case for recovery under the policy.

■ The defendant has raised two affirmative defenses to the *prima facie* case made out by the plaintiff. The defendant, of course, bears the burden of establishing its affirmative defenses by a preponderance of the evidence. *Saskatchewan Government Insurance Office v. Spot Pack, Inc.,* 242 F.2d 385, 389 (5th Cir. 1957); 9 G. Couch, *Cyclopedia of Insurance Law* § 38:82 (2d ed. 1962) [hereinafter cited as Couch].

The defendant contends first that a warranty of seaworthiness by the insured should be implied in the yacht policy herein,

and that said warranty was breached by plaintiff rendering the policy void *ab initio.*

Although the Court intimates no view as to the legal merit of the implication of such a warranty, it will assume for the purposes of this case that a warranty of seaworthiness should be implied into a time policy in the absence of an express warranty in the policy itself. *See, e. g., McAllister Lighterage Line, Inc. v. Insurance Co. of North America,* 244 F.2d 867 (2d Cir.), *cert. denied,* 355 U.S. 872, 78 S.Ct. 123, 2 L.Ed.2d 77 (1957); *Henjes v. Aetna Insurance Co.,* 132 F.2d 715 (2d Cir.), *cert. denied,* 319 U.S. 760, 63 S.Ct. 1316, 87 L.Ed. 1711 (1943); *Neubros Corp. v. Northwestern National Insurance Co.,* 359 F.Supp. 310, 315–16 (E.D.N.Y. 1972); 9 Couch § 37:1628. *But see* G. Gilmore & C. Black, *The Law of Admiralty* 65 (2d ed. 1975). Similarly, the Court will further assume that such a warranty is properly implied where the insured vessel is a pleasure craft and not owned by a professional shipowner. *But see Mathis v. Hanover Insurance Co.,* 127 Ga.App. 89, 192 S.E.2d 510 (1972); *Johnson Bros. Boat Works v. Conrad,* 58 N.J.Super. 334, 156 A.2d 175 (1959); 45 C.J.S. *Insurance* § 652 (Supp.1978); 9 Couch § 37:1631 (Supp.1978).

Seaworthiness is "the ability of a vessel adequately to perform the particular services required of her on the voyage she undertakes." *McAllister Lighterage Line, Inc. v. Insurance Co. of North America, supra,* 244 F.2d at 870. The insured's warranty of seaworthiness is *not* a warranty of soundness, that the vessel has no latent or inherent defects, or that it was designed to optimum engineering standards.

■ The Court must conclude upon all the evidence in the case that the warranty of seaworthiness was not breached at any relevant time by the plaintiff. The yacht was seaworthy within the meaning of the insurance warranty and was fully fit for its intended use and service on November 10, 1975, the date the policy attached. That the plaintiff was unhappy with its purchase—unhappy because it felt the yacht did not meet the expected standard for luxury and required nettlesome upkeep—

does not alter the finding that the boat was seaworthy in all essential respects. From the date of delivery, the yacht continuously underwent all necessary maintenance and repair, and any condition that possibly might have had an impact on the safety of the craft was always cured by immediate corrective action. A catalog of defects which relate to the personal satisfaction of a purchaser of a boat is not coterminus with defects which may render a boat unseaworthy by affecting its safety or fundamental operation. Plaintiff's complaint that the yacht's performance fell short of the level warranted by the manufacturers notwithstanding, the yacht was always seaworthy for insurance purposes.

Moreover, the yacht was fully seaworthy on the morning of July 3, 1976, when it sailed on what was to become its last voyage. The yacht had been fully repaired and tested, and was uncontrovertibly· fit for the voyage of July 3rd. Defendant has failed to establish that the warranty of seaworthiness was breached by plaintiff, and that affirmative defense must fail. Plaintiff's recovery is not barred on that ground.

■ The defendant contends, as a second affirmative.defense, that the policy in suit was void from inception because of the alleged failure of the plaintiff to disclose the breakdowns of the vessel, the filing of a lawsuit against the manufacturers, and the results of the Blumenstock survey. Defendant argues that these facts were material to the risk, and that the plaintiff breached its implied duty to disclose such facts, rendering the policy void *ab initio*.

■ It is undeniable that parties to a contract of marine insurance must be held to a standard of the highest fidelity in their dealings. The doctrine of *uberrimae fidei* obligates the assured to volunteer information which might have a bearing on the scope of the risk assumed, and the failure to do so will allow the insurer to avoid the policy. *Gulfstream Cargo, Ltd. v. Reliance Insurance Co.,* 409 F.2d 974 (5th Cir. 1969); *Fireman's Fund Insurance Co. v. Wilburn Boat Co.,* 300 F.2d 631, 646–47 (5th Cir.) (dictum), *cert. denied,* 370 U.S. 925, 82 S.Ct. 1562, 8 L.Ed.2d 505 (1962); *King v. Aetna Insurance Co.,* 54 F.2d 253, 254 (2d Cir. 1931); *Btesh v. Royal Insurance Co.,* 49 F.2d 720, 721 (2d Cir. 1931); *Navegacion Goya, S. A. v. Mutual Boiler & Machinery Insurance Co., supra,* 411 F.Supp. at 935; *Anne Quinn Corp. v. American Manufacturers Mutual Insurance Co.,* 369 F.Supp. 1312, 1315 (S.D.N.Y.1973), *aff'd mem.,* 505 F.2d 727 (2d Cir. 1974); *Neubros Corp. v. Northwestern National Insurance Co., supra,* 359 F.Supp. at 317; *Rosenthal v. Poland,* 337 F.Supp. 1161, 1168 (S.D.N.Y.1972); *Stecker v. American Home Fire Assurance Co.,* 299 N.Y. 1, 6, 84 N.E.2d 797 (1949). There is a reciprocal duty on the part of the insurer to deal fairly, to give the assured fair notice of his obligations, and to furnish openhandedly the benefits of a policy of "all risks" insurance. Insurance obligations must not be construed so as to render the coverage mere gossamer.

The Court finds that the assured's duty to disclose was not breached in this case. Nothing was withheld from the defendant that should have been disclosed.

■ The credible evidence is that the defendant's agent with whom plaintiff dealt was fully familiar with the plaintiff's dissatisfaction with the performance of the yacht and its manufacturers under the warranties of sale. The agent also knew of the lawsuit plaintiff was eventually forced to commence seeking a remedy for alleged violations of the manufacturers' warranties. The knowledge of the underwriter's agent must be imputed to and is deemed the knowledge of the defendant. *The Anthony D. Nichols,* 49 F.2d 927 (S.D.N.Y.1931); *Chauser v. Niagara Fire Insurance Co.,* 123 Conn. 413, 196 A. 137 (1937); *Lampke v. Metropolitan Life Insurance Co.,* 279 N.Y. 157, 18 N.E.2d 14 (1938); *Bible v. John Hancock Mutual Life Insurance Co.,* 256 N.Y. 458, 176 N.E. 838 (1931); *Lau v. Guardian Life Insurance Co. of America,* 76 Misc.2d 451, 350 N.Y.S.2d 858 (App. Term 1973); 16A J. Appleman, *Insurance Law & Practice* § 9101 (1968). The insurer's agent, acting with knowledge and with authority to recommend cancellation of a policy when material facts are disclosed, waived any

right of the defendant to withhold or avoid the policy on the ground of nondisclosure by issuing the policy in suit to the plaintiff.

The defendant must also be charged with knowledge of both the design features of the insured yacht and the normal pattern of expectable maintenance and upkeep of such a yacht, which are part of "the course and incidents of the trade [and] must necessarily be imputed to the underwriters." *Buck v. Chesapeake Insurance Co.,* 26 U.S. (1 Pet.) 151, 160, 7 L.Ed. 90 (1828); *see also Anne Quinn Corp. v. American Manufacturers Mutual Insurance Co., supra,* 369 F.Supp. at 1315; 9 Couch § 38:106.

The defendant routinely accepted risks on boats manufactured by Chris Craft, an established, reputable builder, well-known to defendant. Moreover, its normal practice was to insure such boats when new and for at least four years thereafter without survey or other inspection. The adoption of this practice represents an admission that the insurer is sufficiently familiar with the builder's design of the yacht and that normal maintenance and cosmetic problems—which are today an unavoidable incident to the purchase of any machine such as an automobile or a boat—are immaterial to its willingness to assume the risk. The Blumenstock survey revealed no more than complaints about leaky windows and fittings, and the surveyor's judgments about certain design features and construction techniques used by Chris Craft. Notwithstanding that the defendant had knowledge—actual, constructive or imputed—of the conditions cited by Blumenstock, none of them affected the safety or seaworthiness of the yacht or was otherwise material to the risk undertaken. The survey itself, where the underlying conditions it reported were known to the insurer or were immaterial to the risk, was not material to the risk, and the failure to disclose it is not a ground for avoidance of the policy.

Similarly, the institution of a lawsuit was not itself a fact material to the risk, whereas the circumstances motivating it may be. *Cf. Gulfstream Cargo, Ltd. v. Reliance Insurance Co., supra,* 409 F.2d at 978 (lawsuit relevant only to establish that owner-assured had actual knowledge of conditions and that the conditions were of some significance). The fact that the plaintiff may have been and is attempting to enforce certain rights under its contract with and warranties from the manufacturers bears neither on the seaworthiness of the yacht nor on the insurer's risk. That the plaintiff, by his attorney, made litigating assertions of unseaworthiness—intended to have an in terrorem effect in the dispute with the manufacturers—does not make the lawsuit any more material to the risk assumed by the defendant. In any event, the defendant through its agent knew of the plaintiff's lawsuit and of the conditions on which it was founded, and the suit affords no basis for denying recovery.

Consequently, upon consideration of all the evidence and finding the testimony of plaintiff's witnesses to be credible and resolving the issues of credibility in plaintiff's favor, the Court finds that plaintiff has established its claim for the amount of the policy, its loss having exceeded that amount, and that defendant has no meritorious defenses of fact or law. Plaintiffs are accordingly entitled to recover $300,000 plus costs and interest from July 3, 1976. The Clerk is directed to enter judgment accordingly.

The foregoing shall constitute the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

SO ORDERED.